UNITED STATES of America,
Plaintiff,

v.

The CONCENTRATED PHOSPHATE EXPORT ASSOCIATION, Inc., American Cyanamid Company, W. R. Grace & Co., International Minerals & Chemical Corporation, Tennessee Corporation and Socony Mobil Oil Company, Inc., Defendants.

64 Civ. 3914.

United States District Court
S. D. New York.

Sept. 11, 1967.

Donald Turner, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., for plaintiff (Burton R. Thorman, E. Leo Backus, Larry D. Knippa, Robert K. Johnson, Washington, D. C., of counsel).

Hollabaugh & Jacobs, Washington, D. C., for defendant The Concentrated Phosphate Export Ass'n Inc. (Marcus A. Hollabaugh and Alan S. Ward, Washington, D. C., of counsel).

Donovan Leisure, Newton & Irvine, New York City, for defendant American Cyanamid Co. (Samuel W. Murphy, Jr., Andrew J. Kilcarr and Vernon E. Vig, New York City, of counsel).

Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, for defendant W. R. Grace & Co. (Douglas E. Cutler and Peter H. Schuck, New York City, of counsel).

White & Case, New York City, for defendant International Minerals & Chemical Corp. (Edgar E. Barton and Abdul W. Wohabe, New York City of counsel).

Guggenheimer & Untermyer, New York City, for defendant Tennessee Corp.

(Randolph Guggenheimer, Leon H. Ty-kulsker and Randolph Guggenheimer, Jr., New York City, of counsel).

Howrey, Simon, Baker & Murchison, Washington, D. C., for defendant Mobil Oil Corp. (Edward F. Howrey and John Bodner, Jr., Washington, D. C., of counsel).

## OPINION

RYAN, District Judge:

This is an action brought to enjoin the price-fixing and business allocation activities of five fertilizer producers in connection with sales of fertilizer, made under the United States Foreign Aid Program, which was destined for the Republic of Korea. The challenged activities were conducted through the defendant Concentrated Phosphate Export Association, Inc. (CPEA), organized by the other defendants, or their respective corporate predecessors, in 1961. All facts have been stipulated. The question of law presented is whether the exemption from the Sherman Act provided for in the Webb-Pomerene Act applies to these transactions.[1]

The parties have stipulated as follows: The issue presented by the pleadings in this case is whether the Concentrated Phosphate Export Association, Inc., a nonprofit membership corporation organized and operated under the Act of April 10, 1918, Ch. 50, 40 Stat. 516, 15 U.S.C. 61–65 (commonly known as the Webb-Pomerene Act), and its members violated Section 1 of the Sherman Act (15 U.S.C. 1) in connection with that portion of the Association's sales of phosphatic fertilizer which such Association made for shipment to the Republic of Korea, where the Board of five Directors of the Association composed of one Director for each Member agreed on selling prices and on allocation of sales among such Members, when United States Government foreign aid funds were made available to pay for said phosphatic fertilizer shipments in accordance with statutes, treaties and regulations applicable to the U. S. foreign aid program.

Plaintiff, conceding that the transactions involved were exports from Florida to the Republic of Korea, contends that because they were part of a United

1. Section 1 of the Sherman Act, as amended, 26 Stat. 209, 15 U.S.C. § 1, provides in pertinent part:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal * * *".

Section 1 of the Webb-Pomerene Act, 40 Stat. 516, 15 U.S.C. § 61, provides in pertinent part:

"The words 'export trade' * * * mean solely trade or commerce in goods, wares, or merchandise exported, or in the course of being exported from the United States or any Territory thereof to any foreign nation; but the words 'export trade' shall not be deemed to include the production, manufacture, or selling for consumption or for resale, within the United States or any Territory thereof, of such goods, wares, or merchandise, or any act in the course of such production, manufacture, or selling for consumption or for resale."

Section 2 of the Webb-Pomerene Act, 40 Stat. 517 (1918), 15 U.S.C. § 62, provides:

"That nothing contained in (the Sherman Act) shall be construed as declaring to be illegal and association entered into for the sole purpose of engaging in export trade and actually engaged solely in such export trade, or an agreement made or act done in the course of export trade by such association, provided such association, agreement, or act is not in restraint of trade within the United States and is not in restraint of the export trade of any domestic competitor of such association: And provided further, That such association does not, either in the United States or elsewhere, enter into any agreement, understanding, or conspiracy, or do any act which artificially or intentionally enhances or depresses prices within the United States of commodities of the class exported by such association, or which substantially lessens competition within the United States or otherwise restrains trade therein.

States program of foreign aid, controlled, managed and funded by the Government, they are not "export trade" within the meaning of the "Webb-Pomerene Act" and consequently were in violation of the antitrust laws. The defendants rest squarely on the Act and answer that since these transactions were literally exports, the fact that they were shipped under the foreign aid program cannot convert them into domestic sales excluded from the statutory immunity. Plaintiff does not otherwise dispute the lawfulness of CPEA's operations under the Webb-Pomerene Act and the only question, therefore, is the application of the Act to these sales.

Plaintiff's reasoning is that the sales in question do not come within the Webb-Pomerene Act because they do not constitute export trade in that they were such an integral part of a United States program which paid for and closely controlled them, that they were tantamount to purchases made by the United States for the benefit of the Republic of Korea and are therefore domestic sales. Plaintiff also urges that, even if these transactions be held to be export trade, they were never within the contemplation of Congress when it legislated the immunity because (a) there was at that time no Foreign Aid Program in which the Government assumed the financial burden and cost for these commodities sold; (b) the price-fixing activities of the defendants injured the United States. The Government also urges that there is no necessity for these defendants to have the benefit of the immunity of the Act for they were not required to meet unlimited competition from suppliers abroad in foreign aid sales. Finally, the Government contends that a contrary interpretation of the immunity of the Webb-Pomerene Act would destroy the purpose of the exemption and frustrate the foreign aid program as well as the Sherman Act.

Summed up, the Government's argument is one a posteriori: from the conclusion that price fixing is per se illegal under antitrust principles in that injury to competition and to the public is presumed, it takes but one step back to conclude that ergo the United States and its citizens, who bore the cost initially of these fixed prices, must have been hurt. The Government reasoning that this was not intended by Congress when it immunized certain sales reaches a conclusion that these sales do not come within the exemptions of the Webb-Pomerene Act, that they are in violation of antitrust law, and, being "illegal per se", are to be struck down.

We have concluded that the answer lies in the wording of the statute. Let us, first, summarize the facts necessary to an appreciation of the question presented.

There is no dispute as to the accuracy of facts advanced by either party in support of its position. They do differ as to relevance and materiality of some of these facts and, of course, as to the conclusions to be drawn from them. The cooperation of counsel at pretrial hearings produced a statement of stipulated facts with exhibits attached; we turn to these:

The defendants are:

CPEA—a non-profit Delaware corporation with its principal place of business in New York, New York, organized on September 12, 1961 to engage solely in export trade as the term "export trade" is defined in the Webb-Pomerene Act, and specifically to engage in trade and commerce in the product known as triple superphosphate and certain other concentrated phosphatic materials. (At all material times, CPEA has been duly registered with the Federal Trade Commission as an association organized and acting under the Webb-Pomerene Act.)

CPEA's five Members: W. R. Grace & Co.; Tennessee Corporation; Socony Mobil Company, Inc.; American Cyanamid Company and International Minerals and Chemical Corporation.[2]

---

2. International Minerals and Chemical Corp. withdrew its membership on June 30, 1966.

Each of these defendant members is a domestic corporation producing chemical fertilizers known as "concentrated phosphates".

CPEA acts as an export selling agency for the concentrated phosphate products of its members. These products are shipped from Florida to Korea and other foreign ports. CPEA handles all phases of developing and negotiation of these sales and this includes all details, such as the submission of bids, shipment, transportation and billing. The management of CPEA is provided for in its by-laws. It is vested in a Board of Directors equal in number to the number of members with each member entitled to nominate one director. CPEA at all times since its formation has been governed by the Board of Directors, each director representing one of its members. The Board of Directors established the minimum price at which materials would be sold by CPEA and the price at which the member would sell to the Association. The Board of Directors also allocated the available business among the members in accordance with the procedures set forth in the Membership Agreements.[3] None of the members bid as individuals on the Korean foreign aid procurements here in suit, all such sales were handled by CPEA.

The Government does not challenge the lawfulness of defendants' operations under the Act except as specifically stated in the issue stipulated. Thus, it does not charge that defendants have in any way restrained the domestic export trade of a competitor or enhanced or depressed prices within the United States—activities which under the wording of the Act would deprive them of its immunity.

There were 13 shipments made from September 1961 (when CPEA was formed) through 1966, in which concentrated phosphates were procured "for shipment directly to and use by the Republic of Korea." This action is concerned with but 11 of these shipments. The materials procured and the costs of these shipments "were paid for with funds from the United States Government made available under its foreign assistance program to the Government of Korea", administered by AID,[4] or its predecessor ICA.[5]

One of the other two shipments was financed with Korean Foreign Exchange Funds, and the other shipment was financed out of a special Stabilization Fund granted in 1961 by the United States to the Republic of Korea to meet Korea's need for foreign exchange and to offset the anticipated short-term reduction in Korea's dollar earnings resulting from Korea's major reform in 1961 of its monetary exchange system. Neither of the two shipments was made subject to ICA or AID regulations; both were handled in accordance with OSROK's[6] applicable procurement procedures. Although payment for this last mentioned shipment was made with United States funds, the Government does not challenge the lawfulness of this transaction.

The authority for the foreign assistance program since 1961 is contained in the Act for International Development of 1961 (AID) (22 U.S.C. § 2151, 75 Stat. 424, 427), which provides authority

---

3. As required by the Act, copies of CPEA's corporate charter, by-laws and membership agreement were filed with the FTC. Annual reports for the years 1961–1965 were also so filed, as well as special reports of annual sales volume. In 1964, at the Commission's request, CPEA submitted a report separately stating the dollar volume of CPEA's 1961–1962 sales believed to have been subject to AID financing.

4. "AID"—Agency for International Development, an agency of the United States Department of State, established in 1961.

5. "ICA"—International Cooperation Administration, the predecessor agency of AID.

6. "OSROK"—Office of Supply, Republic of Korea, the Korean governmental agency responsible for procurement of commodities for the Government of Korea.

to the President "to furnish assistance on such terms and conditions as he may determine in order to promote the economic development of less developed friendly countries and areas, with emphasis upon assisting the development of human resources through such means as programs of technical cooperation and development." (Sec. 211)

Among the terms and conditions, which must be met before eligibility for foreign aid is determined, is that the President find that the assistance proposed would not have a substantially adverse effect on the United States economy.

Following World War II, the United States Government made funds available to many countries to pay for commodities, including fertilizer, sold by commercial companies and shipped from the United States and other free-world sources to the recipient countries. Foreign aid funds have been made available from time to time both prior to and after 1961 to pay for various commodities such as fertilizer, including concentrated phosphates for the Republic of Korea through Acts of Congress beginning with the Mutual Security Act of 1954, 68 Stat. 832.[7]

This assistance is made available to Korea through various treaties and agreements. The relevant agreement here is "The Economic Technical and Related Assistance Agreement between the United States and the Republic of Korea of February 8, 1961". Concern for the economic and general welfare of the United States in the furnishing of this foreign aid is reflected in this Agreement for it is provided that the assistance to be given shall be subject to applicable United States laws and regulations. It is also provided that the Korean Government is to cooperate with the United States Government to assure that procurement will be at reasonable prices

and on reasonable terms. It is further provided that

"All or any part of the program of assistance provided hereunder may be terminated by the Government of the United States if it determines that because of changed conditions the continuation of such assistance is unnecessary or undesirable."

The Foreign Aid program was supported by funds appropriated annually by Congress on budget requests and recommendations of the State Department and AID, stating the basis of detailed proposals which were made following negotiations with foreign countries seeking assistance. The funds appropriated by Congress were made available by AID in the form of loans or grants in accordance with the applicable statutes, agreements, and regulations. Foreign aid funds have not been used to procure commodities for use or resale in the United States.

The expenditure of funds AID allocated for Korean commodity imports was subject to AID's approval of "Procurement Authorization Applications", submitted by agencies of the Korean Government to AID from time to time. AID's approval of Korean fertilizer procurements was made either in the form of a "Procurement Authorization" issued to OSROK or a "Procurement Authorization, U. S. Government Agency Purchase Requisition" issued to GSA.

AID, which was officially characterized as essentially a financing institution, did not itself procure any concentrated phosphates for Korea.

The Government of Korea had no obligation to repay the amounts granted by the United States, but the concentrated phosphates procured with AID financing were sold to Korean consumers by a Korean Government agency and the Korean currency (hwan) received from such sales was deposited by the selling

---

7. Although plaintiff disputes their similarity, defendants say that foreign aid programs go back at least to 1948 and the Marshall Plan and even farther to the time the Webb-Pomerene Act was enacted, when Congress also enacted the Organization of American Relief in Europe in 1918. The signficance of this will appear later.

agency in an account at the Bank of Korea in accordance with agreements between the United States and Korean governments. The Korean currency generated by such sales was not necessarily equal to the United States dollar value of the fertilizer sold. Such deposits were called "counterpart funds" and were used to support, in part, Korean and United States military establishments in Korea and for other purposes mutually agreed upon by the governments of the United States and Korea, including financing public works projects of the Korean Government. These funds were also available to the United States "as requested" but the Korean Government could also draw against them. Agreement between the two countries as to the disposition of unencumbered balances was subject to approval of Congress.

It appears that of the 13 transactions in which Korea purchased concentrated phosphates for import and consumption, 11 were handled directly by OSROK issuing the invitation for bids and that the other 2 transactions were handled by General Services Administration (GSA). Where OSROK was the procuring agency, CPEA registered in Korea as a bidder as required by Korean regulations, and its bids were submitted there to OSROK and shipped on OSROK's call or requisition. OSROK, as buyer, handled the insurance; all disputes arising from the performance under the contract were adjusted and settled in Korea.

The following administrative procedure was taken where the procurement authorization issued to OSROK:

1. OSROK's submission to AID of a Procurement Authorization Application.

2. AID's issuance of a Procurement Authorization, a portion of which constituted a letter of commitment by AID to a specified United States Banking Institution to reimburse the bank for payment made to suppliers of the material being procured.

3. Invitation for Bids issued by OSROK requesting bids in compliance, inter alia, with AID Regulation No. 1.

4. AID's issuance of a Small Business Circular entitled "Trade Opportunities for American Suppliers", publishing the invitation for bid.

5. OSROK's Abstract of Bids received.

6. Lists of Successful Bidders prepared by OSROK and transmitted to AID.

7. Notice of Award issued by OSROK and in this instance addressed to CPEA.

8. Notice to supplier of Opening of Letter of Credit.

9. Letter of Credit with conditions issued to CPEA by J. Henry Schroder Banking Corporation, New York, hereinafter called "Schroder Bank".

10. A performance bond of the supplier.

11. Voucher of Schroder Bank to the United States Government claiming payment and stamped by the United States Treasury Department as "paid", and attached documents in support thereof, including the invoice of CPEA and its Supplier's Certificate.

OSROK described on its application the type and amount of fertilizer it required; the proposed area of source; the proposed basis and time of delivery; the United States Banking Institution; the estimate of cost; how it would ship the commodities f. o. b. on United States flagships; how it would evaluate the bids; the condition of the fertilizer (that it meet United States Federal Specification Inspection terms); and a detailed "End-use Justification" for such authorization.

Where GSA was the procuring agency it issued "Invitations for Bids" on its standard form and its acceptance of any bid was endorsed at the foot of the face

page of the form in the name of the "United States of America by the Contracting Officer". Bids were invited to be submitted to GSA which indicated the recipient country, and code and delivery was specified as FAS or FOB vessel.

The bid tabulation of GSA shows that bids were received for delivery FOB vessel at Tampa, Florida, and for delivery FOB vessel in Tunisia and Portugal. Awards to successful bidders were made after review by GSA personnel. Invoices with supporting documents, including bills of lading, were submitted to GSA for payment. The shipper was designated as GSA with consignment to OSROK. Delivery by the supplier was established by a "Material Inspection and Receiving Report".

In short, GSA handled all incidents of the procurement from the invitation to bid to acceptance at the point of shipment, made shipment of the goods and made payment of the freight as well as payment of the purchase price.

The details of the control which the United States Government exerted over the Foreign Aid Program are spelled out in the Regulations adopted by AID for carrying out the program.

Upon the filing of a Procurement Authorization Application by the cooperating country to procure specified commodities against its allotment of AID funds, AID issued the Procurement Authorization after determination that the proposed purchase was in accordance with the objectives of the Act. The Procurement Authorization issued by AID either to OSROK or to GSA specified the commodity and the maximum amount of money which would be provided, the delivery periods, the source from which the commodity might be obtained, and other provisions deemed necessary by it.

Among the requirements imposed by Regulation 1 upon the cooperating country is that at least fifty percent of the gross tonnage of all commodities financed

by AID transported by ocean vessels to the cooperating country must be carried in privately owned United States flag commercial vessels. Another is that where formal competitive bidding is used, as was done with all the relevant procurements, copies of the invitation for bids must be sent to the Office of Small Business, AID, to give United States suppliers an opportunity to bid.[8] It also was further provided that if it appeared that "the objective of lowest competitive market price is not being met", AID would take appropriate action to impose additional limitations and might require, a refund of the entire amount or as against the supplier of the amount by which the price exceeded the maximum price permitted by the regulation. Specific calculations were set forth for determining the permitted maximum price where there was no available competitive market. Even in instances of delivery FOB, AID reserved the right to divert the shipment at any time before delivery and to vest title in transit "if necessary to assure compliance with any Act of Congress."

As to the Supplier, Regulation 1 also required that, to obtain payment, the Supplier (here the defendants) had to complete an AID form called the Supplier's Certificate in which he acknowledged that the procurement was to be paid for from funds made available by the United States pursuant to AID Regulation 1. The Supplier agreed to make appropriate refund to AID upon demand, in the event of non-performance under his contract, for any breach of the certificate or for any false certification. The Supplier in addition certified that (1) the price did not exceed the market price; (2) that he had not given or received, and would not give or receive any side payments or "kickbacks"; and (3) that he had not paid any contingent fees or commissions except as stated. This certificate, under "Notes", provides "(b) False statements herein are punishable

8. It is stipulated that in all 13 purchases CPEA directly competed for AID financed sales to Korea with domestic and eligible foreign producers of concentrated phosphates.

by United States law." An important modification of the form certificate made in 1964, further provides that. the agreement between the supplier and AID incorporated in the certificate shall be deemed to be a contract made under the laws of the District of Columbia. The 1964 revision requires too that the supplier maintain his records for a period of at least five years available for examination by AID.

As to the banks involved, Regulation 1 spelled out the responsibilities of the banking institutions. Generally, the bank is responsible for collection of the documents required, including the Supplier's Certificate, and for determining whether "in accordance with good commercial practice" the shipment complies with the requirements set forth in the letter of commitment as to delivery, source, destination, description and discounts or commissions. While the American bank operates under a letter of credit from the Bank of Korea, it looks not to the Bank of Korea but to the United States Government for payment, under the letter of commitment issued by AID to the bank set forth in AID's agreement to reimburse the bank for payments made against the account of the approved applicant which may be applicable to the procurement.

Adherence to these requirements was a condition imposed on suppliers by the Korean Government under OSROK's General Provisions for Bidding. These provisions limited the Korean Government's contractual liability to the suppliers by conditioning its obligation on the receipt by the latter of the pertinent letter of commitment from AID.

The control of the United States over the OSROK'S procurements is clearly defined. This control is even more evident in those instances where GSA was the procuring authority, for there, although Korea appeared as the "recipient country", the award was signed on behalf of the United States of America who, through GSA, made payment to the bank upon submission of invoices to it by the supplier. By agreement between GSA and AID's predecessor, ICA, AID provided GSA with funds to pay for the cost of commodities. Following ordinary usual Governmental bidding procedure, the bids were sent to Washington and one of the standard bidding provisions was that the contract would be awarded to the bidder whose bid was most "advantageous to the Government, price and other factors considered."

One cannot logically dispute plaintiff's conclusion that the GSA procurements represent the ultimate in control by the United States over the expenditure of foreign aid funds in the Korean fertilizer procurements and that they emphasize the close regulation and control provided for to insure the proper and judicious expenditure of United States funds under the foreign aid program.

■ We do question the Government's further statement that by reason of this control the real contracting party for the commodities was the United States and that the transactions were therefore not "export trade", but domestic trade. We find to the contrary—the transactions were "export trade", especially in view of the concession by the Government that the goods sold by defendants were "for shipment to the Republic of Korea" procured by or on behalf of Korea by either OSROK or GSA acting as "the procurement agency" and that the commodities were used in Korea.

We also do not accept or agree with defendant's argument that AID was but an incidental party to the transaction—no more than the usual financing institution found in international transactions where there are problems of currency exchange. AID was at the center of the transactions, it was the force which initiated, directed, controlled and financed them. Without AID, there would have been no sale or purchase and the extent of the role it played was known in every detail to and relied on by both parties to the transaction, particularly by the supplier who looked to it for payment and obligated itself to conform to its requirements and conditions if he was to

receive payment. We find, however, that defendants were selling to the Korean Government. This we find, that the transaction was an "export" even where GSA was described in its procurement authorization and related documents as the "purchaser". The AID regulations referred to these transactions as "exports". It has been stipulated that AID did not purchase concentrated phosphates for consumption or resale. It is plain from the stipulated facts and from the very raison d'etre of the foreign aid program that the "cooperating country" and not the United States is the purchaser.

Plaintiff also stresses as an important factor that the Korean Government was under no obligation to repay these "grants" or "loans".[9] But we find this not to be the fact for, while Korea may not have signed a promissory note payable on demand in equivalent funds with interest, it did obligate itself to the extent that the Korean funds it received on resale of the commodities were to be deposited and used by it in accordance with its agreement with the United States and to be available to the Government of the United States in the manner required by it. This condition was hardly consistent with an outright gift of money to Korea. Indeed, the Government itself has pointed out that, despite the general statement of the purpose behind the Foreign Assistance Act, the Act makes it clear that Congress had no intention of writing a "blank check" for the underdeveloped countries to spend at will. AID Administrator David E. Bell, before the Senate Banking and Currency Committee (111 Cong.Rec. 5373 (1965)), testified:

> "The foreign aid program provides goods and services to other countries which they cannot obtain through normal means—through their export earnings and through obtaining capital on commercial terms and by private investment. A successful aid program is one which enables the recipient country to strengthen its economy to the point where it can obtain goods and services it needs for steady expansion and growth by normal trade and normal capital movements—and without further need for aid grants and soft loans * * *. It is plainly important to seek to carry out this important national program like any other, at minimum cost to the United States."

The commodity involved in these transactions was produced in the United States. It was loaded on ocean going vessels sailing from a United States port, with shipping documents naming the Korean Government as consumer and Korea as the destination. The risk of loss was not with the supplier for title passed from the supplier to OSROK (or the designee of ICA) and the Korean Government was named as shipper and consignee in the f. o. b. vessel bills of lading. The sales in question are clearly "export trade" and exempt from the antitrust laws unless it is provided to the contrary in the Webb-Pomerene Act.

This brings us to plaintiff's second argument, which is that, although the transactions may be literally export trade, in the context and against the background of the Act, they are not or cannot be the export trade intended by the Act, and that an examination of the legislative history of the Act demonstrates that it was not Congressional intent to include this type of transaction within the statutory exemption, for the reason that it never contemplated this type of transaction where the United States Government was the financing party. The argument of the Government, attempting to divine a Congressional intent, continues that had Congress contemplated such foreign aid transactions would occur, it would not have exempted them.

In support of this ingenious argument, the Government puts emphasis upon the fact that Congress in the Act made it clear that the activities exempted were not "to operate to the prejudice of the

---

9. Neither the tender nor award documents nor AID regulations make any distinction between the two forms of financing.

American public" or "punish the people of the United States" and that, if that should be the result of the activities, they would not be immune. The Government further argues that the defendants frustrated the AID "objective of lowest competitive market prices" because, in aggregating the manufacturing and selling resources of five very substantial size companies, whose competitors, in most of the larger procurements herein, could furnish only a limited portion of the requirements, defendants eliminated much of the competition which would otherwise have existed. Having thus frustrated the objectives of the foreign aid program, the Government reasons defendant cannot now claim the immunity of the provisions of the Webb-Pomerene Act simply because of the format of their Association.

It may be that competition within the United States was curtailed among those five, although it has been stipulated that all CPEA-AID financed sales were obtained as a result of competitive bidding and that CPEA has faced world-wide competition for all sales from eligible sources. The argument concludes that, since Congress could not have intended to protect activities which injured the United States, the activities of the defendants are not protected and ergo come within the antitrust laws and are illegal under them.

Much as plaintiff strains at the meaning of the words "export trade", we are unable to find any ambiguity in them.

"To export" had at the time the Act was enacted the same meaning that it now has—"to carry or send abroad, especially to foreign countries" There is nothing to indicate that the Congress did not intend them to have this meaning; the Act itself refers to export as "goods exported from the United States to any foreign nation.[10] On the face of the statute, the transactions were exempt from the antitrust laws.

■ Judicial construction should be used not to create doubt, but only to resolve one. Where there is no doubt, there is nothing to construe (United States v. Rice, 327 U.S. 742, 753, 66 S.Ct. 835, 90 L.Ed. 982; Hamilton v. Rathbone, 175 U.S. 414, 20 S.Ct. 155, 44 L.Ed. 219). We should not under the guise of "construction" rewrite the statute; obviously, this is not a judicial function. (Palmer v. Commonwealth of Massachusetts, 308 U.S. 79, 83, 60 S.Ct. 34, 84 L.Ed. 93 (1939).)

The distinguishing feature, observes the Government, is that "In the context of the era and Congressional attitude, as reflected in the legislative history, 'export trade' has the common meaning of United States goods shipped to foreign nations and paid for by foreign buyers in a net transfer of wealth to this nation."

Accepting this definition, foreign aid financed trade is foreign trade, since there is a "net transfer of wealth to this nation", if not in dollars, certainly in its equivalence by the assurance of the economic and military stability of friendly nations. The return of wealth to this country may well be incalculable and far exceed measurement in dollar and cent standards.

But, in support of its position that Congress never envisaged immunizing transactions of this sort when the United States was the one paying the fixed price,

---

10. The Act specifically defines what is excluded from the words "export trade" by stating that they shall not be deemed to include the production, manufacture or selling for consumption or resale "within the United States" which it defines as trade "among the several states".

The United States Department of Commerce gives the official definition of exports as "the physical movement of merchandise out of the United States customs to foreign countries without regard to the method of financing." Census Bureau, Monthly Report of U.S. Export Report F.T. 410.

In 1903, the Supreme Court defined the word "export" as used in the Constitution and the laws of the United States to mean the "transportation [of goods] from this to a foreign country." Swan & Finch Co. v. United States, 190 U.S. 143, 146, 23 S.Ct. 702, 703, 47 L.Ed. 984.

the Government points to the purpose of the Webb-Pomerene Act, which appears to have been to enable the domestic companies to compete with large foreign combines by permitting them to combine their capital and establish selling agencies to reduce their expenses of advertising and cultivating world trade as well as to affect the power of cartels. (H.R.Rep. #50, 65th Cong., 1st Sess. p. 2, 1917; 55th Cong.Rec. 3576 and 2785.)

Defendants say that it had another purpose—foreign aid, because at the time that Congress was making extremely large appropriations for foreign assistance and was authorizing the issuance of bonds to provide the funds for those appropriations under the form of "export credits" to be expended by the foreign countries for the purchase of American goods, there was no real prospect that these loans or credits would be repaid. Therefore, defendants urge that Congress did envisage the transactions in suit.

In further support of its argument, the Government contends that it is clear from the discussions leading up to the exclusions contained in the Act that the reason Congress immunized these trade export associations was that Congress was not overly concerned with what price was being exacted of a foreign purchaser, because there the American public was not bearing the financial brunt.

Herein is the core of the Government's argument; we cannot say that it does not have appeal. It seems obviously unfair to the United States, which paid these defendants, to permit the defendants to charge an artificially set price and deprive the Government of price benefits which might come from competitive trade conditions within the United States.

It is plain from the remarks of the proponents of the Act made in Congress when the Act was being considered that they were concerned that no injury befall to the domestic purchaser from this Act.

The remarks of Senator Pomerene were, in part, that:

" * * * although an association organized under the pending bill should enter into some agreement or perform some act in a foreign country which met the requirements of law there, if at the same time the effect of it were such as to materially interfere with the policy of the United States under its trust laws, then it would be subject to the jurisdiction of the authorities of this country, including both the Federal Trade Commission and the Department of Justice." (56 Cong.Rec. 170) Congressman Webb stated:

"I would be willing that there should be a combination between anybody or anything for the purpose of capturing the trade of the world, if they do not punish the people of the United States in doing it." (55 Cong.Rec. 3580)

Another proponent of the bill said that its purpose was "to make that which is illegitimate relating to the people of the United States perfectly legitimate when relating to foreign peoples;" (55 Cong. Rec. 2788); and that it was not the duty of Congress to look after the interests of foreign nations.

The Report of the Senate Committee states:

"But while the purpose of these associations is to improve and extend our foreign trade, their business ought to be so conducted as to harmonize with the requirements of our laws respecting domestic trade and without injuring any domestic competitor in the foreign trade or unduly thereby enhancing prices to domestic consumers." Sen. Rep.No.109, 65th Congr., 1st Sess. p. 2 (1917).

It was because Congress was concerned that the Act be not used to the detriment of domestic trade that it limited immunity to an association, agreement or act which was not in restraint of trade within the United States and not in restraint of the export trade of any domestic competitor of such association or which artificially, or intentionally, enhanced or depressed prices of lessened competition or restrained trade within the United States, none of which is charged here.

The Government's final argument is that the defendants' activities burdened and frustrated the Foreign Aid Program because the burden of any price-fixing activities as to foreign aid procurements is borne directly by the American taxpayer, not by a foreign nation or consumer as in the ordinary export trade transaction. The added charge upon AID financed procurements, it urges, limited the attainment of the United States' foreign aid objectives.

It is undisputed, however, that officials of AID, OSROK and GSA were aware of CPEA's status as a "Webb" association; its membership was no secret to them; and they knew CPEA's material was being offered for sale in response to invitations to bid to supply phosphatic materials for shipment directly to Korea. Defendants, along with other "Webb" associations, were encouraged by the Government agencies to participate in these programs.[11] It is true that this was an entirely business-motivated participation of the "Webb" associations but that is not to say that all these associations fixed prices and allocated territories for there is no evidence one way or the other. We assume, however, if several competitors do join in such an association, they do so for their mutual benefit.

Factually, it does appear that the activities of CPEA were known for as required by the provisions of the Webb-Pomerene Act, a report of CPEA's formation was made to the Federal Trade Commission (FTC) on October 6, 1961; and copies of the corporate charter, by-laws and membership agreements were filed with that report. All amendments to the charter and the membership agreements were reported to the FTC. CPEA also filed with the FTC annual reports for the years 1961 through 1965 in accord with provisions of the Webb-Pomerene Act, and responded to FTC's requests for special reports of, among other things, annual sales volume. In 1964, CPEA submitted to the FTC, at the Commission's request, a report which separately stated the dollar volume of CPEA's 1961–1962 sales believed to have been subject to AID financing.

If these activities were found to have been harmful to the foreign aid program, AID was not without remedy or means to discourage and stop such activities. Regulation I provided that the price was not to exceed the market price prevailing in the United States, or a price to be determined if there was no available market, with the privilege on the part of AID to seek a refund of the entire amount or of the excess charge and to cancel the transaction. These were terms to which the suppliers agreed. AID, however, has taken no action in this respect; perhaps, it is because it has found that the price, although artificially fixed, is not unreasonable.

All that we have before us is a claim of violation of antitrust laws.

We conclude that there is no violation of antitrust laws because the activities of defendants were immunized by the Webb-Pomerene Act.[12]

Complaint is dismissed upon the merits and the Clerk of the Court is directed to enter judgment of dismissal in favor of the defendants. So ordered.

11. Webb associations other than CPEA have sold and are selling under the AID program and have sold under foreign aid programs administered by ICA. In addition, under different statutory and regulatory requirements, the U. S. Government has furnished funds to finance export sales of agricultural products by Webb associations under the Public Law 480 program administered by the United States Department of Agriculture. Webb associations sold, too, under the Lend Lease program at least from 1941.

12. Apparently the question of whether defendants who are selling in connection with foreign aid programs should enjoy such immunity is not novel. It appears that Congress has reviewed the Webb-Pomerene Act on a number of occasions over the years and, on such occasions, spokesmen for the Justice Department often have advocated its outright repeal. Congress, however, has thus far declined to either amend or repeal the statute.