UNITED STATES *v.* CONCENTRATED PHOS-
PHATE EXPORT ASSN., INC., ET AL.

No. 29.   Argued October 24, 1968.—Decided November 25, 1968.

*Deputy Attorney General Christopher* argued the cause for the United States. On the brief were *Solicitor General Griswold, Acting Assistant Attorney General Zimmerman, Lawrence G. Wallace,* and *Howard E. Shapiro.*

*Samuel W. Murphy, Jr.,* argued the cause for appellees. On the brief were *Marcus A. Hollabaugh* and *Alan S. Ward* for Concentrated Phosphate Export Assn., Inc., *Mr. Murphy* and *Andrew J. Kilcarr* for American Cyanamid Co., *Lawrence J. McKay* and *Jerrold G. Van Cise* for W. R. Grace & Co., *Edgar E. Barton* for International Minerals & Chemical Corp., *Edward F. Howrey* and *John Bodner, Jr.,* for Mobil Oil Corp., *Alfred D. Berman* and *Randolph Guggenheimer, Jr.,* for Tennessee Corp., appellees.

MR. JUSTICE MARSHALL delivered the opinion of the Court.

Involved in this case are 11 sales of concentrated phosphate made between 1961 and 1966 by appellee association. The phosphate was supplied by the association's members,[1] which are all producers of fertilizer, and was

---

[1] Appellee-members are American Cyanamid Co., W. R. Grace & Co., International Minerals & Chemical Corp., Tennessee Corp.,

then shipped to the Republic of Korea under the United States foreign aid program. The Government, in a civil antitrust complaint filed on December 21, 1964, contended that the concerted activities of the association and its members in regard to these 11 sales violated § 1 of the Sherman Act, 26 Stat. 209 (1890), as amended, 15 U. S. C. § 1. Appellees defended on the ground, *inter alia,* that their activities were exempted from antitrust liability by § 2 of the Webb-Pomerene Act, 40 Stat. 517 (1918), 15 U. S. C. § 62,[2] as "act[s] done in the course of export trade." The trial court held that the Webb-Pomerene Act did immunize appellees' conduct, 273 F. Supp. 263 (1967), and dismissed the complaint.

---

and Mobil Oil Corp. Not all of these companies were members during the entire period involved in this case; the association was dissolved on December 28, 1967.

[2] "Nothing contained in sections 1–7 of this title shall be construed as declaring to be illegal an association entered into for the sole purpose of engaging in export trade and actually engaged solely in such export trade, or an agreement made or act done in the course of export trade by such association, provided such association, agreement, or act is not in restraint of trade within the United States, and is not in restraint of the export trade of any domestic competitor of such association: *Provided,* That such association does not, either in the United States or elsewhere, enter into any agreement, understanding, or conspiracy, or do any act which artificially or intentionally enhances or depresses prices within the United States of commodities of the class exported by such association, or which substantially lessens competition within the United States or otherwise restrains trade therein."

Section 1 of the Act, 40 Stat. 516 (1918), 15 U. S. C. § 61, defines "export trade" as "solely trade or commerce in goods, wares, or merchandise exported, or in the course of being exported from the United States or any Territory thereof to any foreign nation; but the words 'export trade' shall not be deemed to include the production, manufacture, or selling for consumption or for resale, within the United States or any Territory thereof, of such goods, wares, or merchandise, or any act in the course of such production, manufacture, or selling for consumption or for resale."

The Government perfected a direct appeal to this Court under the Expediting Act, 32 Stat. 823 (1903), as amended, 15 U. S. C. § 29. Probable jurisdiction was noted, 390 U. S. 1001 (1968).

## I.

We are met at the outset with appellees' contention that this case is now moot. Appellees' argument rests on two events which occurred after the case had been submitted to the District Court. On January 1, 1967, the Agency for International Development (AID), the State Department agency in charge of the foreign aid program, amended its regulations to preclude Webb-Pomerene associations from bidding on certain procurement contracts whenever procurement was limited to United States suppliers.[3] According to appellees, this new regulation made it uneconomical for the association to continue in operation,[4] since a large proportion of AID-financed procurement is limited to American sources.[5] Accordingly, on December 28, 1967, appellee association dissolved itself.[6] The new regulation and the dissolution, we are told, moot this case.

Two factors make this argument untenable. First of all, the dissolved association was not the only defendant in this case. The Government sought injunctive relief against the association's members as well; they were to be

---

[3] 31 Fed. Reg. 16693 (1966), codified as 22 CFR §§ 201.01 (v), 201.52 (a) (7), Appendix D (1968). The amended regulation applies only to certain specified commodities.

[4] Motion to Affirm or Dismiss 5, 14–15.

[5] See AID, Operations Report, Fiscal Year 1967, p. 74. The very large percentage of foreign aid procurement actually coming from American sources exceeds that required by regulation.

[6] Appellees contend that economic factors dictated the dissolution, *supra*, n. 4, and the Government does not argue that the dissolution was related to the fact that a notice of appeal in this case was filed on November 9, 1967.

prohibited from forming any new export associations without court approval and from continuing in effect any prices jointly agreed upon. Therefore, even if dissolution would have made it impossible to frame effective relief were the association the only party, here there is no such difficulty. Secondly, the new AID regulation does not apply to all contracts on which the former members of the association might bid. Whenever foreign bidders are eligible, AID still permits American Webb-Pomerene associations to compete. In fact, foreign bidders were eligible in all 11 of the transactions which gave rise to this suit. Therefore, however much the new regulation may reduce the practical importance of this case, it does not completely remove the controversy. Absent the relief prayed for, appellees would be free to act in concert in certain situations where the Government contends they must compete.

The test for mootness in cases such as this is a stringent one. Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave "[t]he defendant . . . free to return to his old ways." *United States* v. *W. T. Grant Co.,* 345 U. S. 629, 632 (1953); see, *e. g., United States* v. *Trans-Missouri Freight Assn.,* 166 U. S. 290 (1897). A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur. But here we have only appellees' own statement that it would be uneconomical for them to engage in any further joint operations. Such a statement, standing alone, cannot suffice to satisfy the heavy burden of persuasion which we have held rests upon those in appellees' shoes. *United States* v. *W. T. Grant Co.,* 345 U. S., at 633. Of course it is still open to appellees to show, on remand, that the likelihood of further violations is sufficiently remote to make injunctive relief unnecessary. *Id.,* at 633–636. This is

a matter for the trial judge. But this case is not technically moot, an appeal has been properly taken, and we have no choice but to decide it.

## II.

The 11 transactions involved in this case were not simple cash purchases by the Republic of Korea.[7] Not only were they financed by the United States Government; AID retained effective control over them at every stage.

The transactions involved were controlled by an impressive network of international treaties and agreements, as well as by American statutes, regulations, and administrative procedures. The procurement process, as revealed by the stipulated record, was rather involved. It began when funds were appropriated by Congress. Those funds were allocated to various development programs by AID, in accordance with the provisions of the applicable statutes and AID's assessments of its priorities. The money allocated to Korea by this process was not simply shipped to Seoul, to be used as Korea wished. In fact, most of it never left this country. In accordance with a series of agreements, Korea was authorized to request that the United States finance purchases of certain "eligible commodities."[8] A rather complicated "Procure-

---

[7] The Government evidently does not contest the "export" status of two fertilizer sales to Korea made in 1962. One was paid for by Korea's own foreign exchange funds; the other was financed out of a special stabilization fund granted by the United States. The use of this latter fund was not as fully controlled as were the grants which financed the 11 purchases involved here.

[8] This particular limitation to a specific list of commodities is contained in the record in a Program Assistance Grant Agreement, dated November 29, 1965. Appendix 108, 116. Although this agreement could not have applied to the earlier transactions involved here, the stipulated record contains only examples—and not a complete compilation—of all the documents involved. In any case, earlier agreements which are included in the record contain limitations which give the Government equivalent powers. See, e. g., Appendix 81.

ment Authorization Application" was then prepared on an AID form for Korean signature. The application sets forth not only the goods to be purchased but also rather detailed specifications of quality, delivery plans, bidding procedures, and a statement explaining Korea's need for the goods. Even though AID officials obviously must have participated in drafting these "requests," AID was in no way obligated to approve them. The agreement with Korea specifically states that AID "may decline to finance any specific commodity or service when, in its judgment, such financing would be inconsistent with the purposes of this grant or of the Foreign Assistance Act of 1961, as amended." When each transaction was approved, a "Procurement Authorization" was issued by AID; it was specifically made subject to detailed regulations which specify the procedures to be followed in awarding any contracts.[9] It also contained an authorization to a specified American bank to pay for the goods to be procured.

After AID had in this way chosen what goods were to be purchased, either of two methods of procurement was used. In two cases, the Government itself let the contracts, through its General Services Administration. In the other nine cases, the formal act of letting the contracts was performed by the Office of Supply of the Republic of Korea (OSROK). In performing this task, the Koreans were subject to detailed regulation by AID. The invitation for bids even had to be submitted to AID so that it could be circulated in this country. All documents had to be in English, and criteria for selecting the winning contractors were carefully defined in advance. An abstract of bids received and a notice naming the contractor selected had to be sent to Washington. Finally, a letter of credit was issued, the supplier paid, and the payor bank reimbursed by the United States Treas-

---

[9] These regulations are collected in 22 CFR § 201 (1968).

ury. The goods were shipped consigned to OSROK, but AID—as a last precaution—reserved the right to vest title in itself if "such action is necessary to assure compliance with the provisions or purposes of any act of Congress." 22 CFR § 201.44 (1968).

We are asked to decide whether transactions of this sort constitute "act[s] done in the course of export trade," within the meaning of the Webb-Pomerene exemption from the Sherman Act.[10] Although the Webb-Pomerene Act has been on the statute books for a half century, this is the first time this Court has been called upon to interpret the meaning of the words "export trade." Upon a full consideration of the language, the purpose, and the legislative history of the statute, we reverse the judgment below.

## III.

The Webb-Pomerene Act was passed "to aid and encourage our manufacturers and producers to extend our foreign trade." H. R. Rep. No. 1118, 64th Cong., 1st Sess., 1 (1916). Congress felt that American firms needed the power to form joint export associations in order to compete with foreign cartels. But while Congress was willing to create an exemption from the antitrust laws to serve this narrow purpose, the exemption created was carefully hedged in to avoid substantial injury to domestic interests. Congress evidently made the economic judgment that joint export associations could increase American foreign trade without depriving American consumers of the main advantages of competition.

This reading of the Act is confirmed both by its structure and its legislative history. The Act itself contains

---

[10] The Government raises no questions under any of the various provisos included in the Webb-Pomerene Act. Accordingly, we intimate no opinion about their scope.

a number of provisos obviously designed to protect domestic interests from the combinations Congress was authorizing. No act done by the export association could be "in restraint of trade within the United States," § 2, 15 U. S. C. § 62; the words "export trade" were to exclude, among other things, "selling for consumption . . . within the United States," § 1, 15 U. S. C. § 61; and the association was forbidden to enter into any agreement "which artificially or intentionally enhances or depresses prices within the United States . . . , or which substantially lessens competition within the United States or otherwise restrains trade therein," § 2, 15 U. S. C. § 62.

The legislative history is even more explicit. During the hearings on the bill, one Congressman, Charles C. Carlin of Virginia, stated clearly what was later to be one of the dominant themes of the floor debate. In a question addressed to the Chairman of the Federal Trade Commission, who was testifying in support of the bill, he said:

> "I am frank to say that personally I have no sympathy with what a foreigner pays for our products; I would like to see the American manufacturers get the largest price possible, but if by indirection we are going to set up a system which is going to fix a higher price eventually at home, through a combination as suggested in this bill, I think you can very well see that such a system is a very dangerous one." Hearings before the House Committee on the Judiciary on H. R. 16707, 64th Cong., 1st Sess., 7 (1916).

The same theme was reiterated on the floor by the Act's two main sponsors. Senator Pomerene said bluntly, "[W]e have not reached that high plane of business morals which will permit us to extend the same privi-

leges to the peoples of the earth outside of the United States that we extend to those within the United States." 55 Cong. Rec. 2787 (1917). And Congressman Webb declared, "I would be willing that there should be a combination between anybody or anything for the purpose of capturing the trade of the world, if they do not punish the people of the United States in doing it." 55 Cong. Rec. 3580 (1917).

In this atmosphere, the Act was passed. It is clear what Congress was doing; it thought it could increase American exports by depriving foreigners of the benefits of competition among American firms, without in any significant way injuring American consumers. Cf. *United States Alkali Export Assn.* v. *United States,* 325 U. S. 196, 211 (1945). The validity of this economic judgment is not for us to question, but it is quite relevant in interpreting the language Congress chose. The question before us is whether Congress meant its exemption to insulate transactions initiated, controlled, and financed by the American Government, just because a foreign government is the nominal "purchaser." We think it did not.

In interpreting the antitrust laws, we are not bound by formal conceptions of contract law. *Simpson* v. *Union Oil Co.,* 377 U. S. 13 (1964). We must look at the economic reality of the relevant transactions. Here, although the fertilizer shipments were consigned to Korea and although in most cases Korea formally let the contracts, American participation was the overwhelmingly dominant feature. The burden of noncompetitive pricing fell, not on any foreign purchaser, but on the American taxpayer. The United States was, in essence, furnishing fertilizer to Korea. AID selected the commodity, determined the amount to be purchased, controlled the contracting process, and paid the bill. The foreign elements in the transactions were, by comparison, insignificant.

It stretches neither the language nor the purpose of the Act to determine that such sales are not "exports."

Appellees contend that a contrary result should be reached because they were competing for contracts with foreign suppliers. Evidently, it is their contention that they therefore fall within the class which Congress intended to allow to form export associations. But AID has already given American suppliers great competitive advantages in their battle with foreign firms. The governing statute requires a preference for American procurement. Foreign Assistance Act of 1961, § 604, 75 Stat. 439, 22 U. S. C. § 2354. On none of the contracts involved here were any of the major trading nations of the world eligible to compete; procurement was limited essentially to the United States and the underdeveloped countries. To say that American producers need an additional stimulus to be able to compete strains credulity. The major impact of allowing the combination appellees desire would not be to encourage American exports; it would be to place the burden of noncompetitive pricing on the shoulders of the American taxpayer. But whatever the impact on exports might be, it is clear that the framers of the Webb-Pomerene Act did not intend that Americans should be deprived of the main benefits of competition among American firms.[11] Since in all relevant aspects the transactions involved here were American, not Korean, we hold that they are not "export trade"

[11] There was a brief mention during the congressional debates of the existence of American loans to European nations whose purchasing power might be reduced by higher American export prices. See 55 Cong. Rec. 2789 (1917). Such an isolated statement cannot determine the meaning of a statute. But in any case, it is clear that America's World War I loans bear little if any resemblance to the modern foreign aid program. Not only was it expected that they would be repaid, but also the loans were not made subject to the detailed American administrative control typical of today's foreign aid program.

within the meaning of the Webb-Pomerene Act. On remand, the District Court may decide the other issues relevant to a resolution of the controversy.

*Reversed.*

MR. JUSTICE HARLAN took no part in the decision of this case.

MR. JUSTICE WHITE, with whom MR. JUSTICE STEWART joins, dissenting.

The majority holds today that concentrated phosphate shipped from an American firm in Florida to the Republic of Korea, which has itself solicited bids on the world market,[1] are not "exports" within the meaning of the Webb-Pomerene Act, § 1, 40 Stat. 516 (1918), 15 U. S. C. § 61. The United States supplied the funds which Korea used to pay for the purchases, and retained limited power to control their expenditure. Korea was not obliged to repay the funds to the United States directly, but it was required to set aside proceeds of resale of the phosphate as "counterpart funds" to be spent in ways prescribed by the United States.[2] This decision conforms neither to the plain meaning of the word "exports" nor to the underlying purposes of the Webb-Pomerene Act.

The statute defines "export trade" as trade in goods "exported, or in the course of being exported from the United States." § 1, 15 U. S. C. § 61. In this case, more than 800,000 tons of concentrated phosphate were shipped directly from the association in Florida to

---

[1] In two of the 11 transactions challenged here, the General Services Administration solicited the bids for Korea, but neither the Government nor the Court finds that distinction significant.

[2] These funds were used to support the Korean and American military establishments in Korea and to finance public works. They were generally available to the United States "as requested."

Korea. In any ordinary sense, these "goods" were "exported from the United States." Even the AID regulations refer to receiving countries as "importers" and to these transactions as "exports." *E. g.*, 22 CFR § 201.42 (1968).[3] And the District Court found that AID encouraged, or at least tolerated, bidding by Webb-Pomerene associations in these transactions. Nor does the exclusion from the definition of exports of goods sold "for consumption . . . within the United States," § 1, 15 U. S. C. § 61, discussed by the majority, have any application to this case. The parties have so stipulated, since the phosphate was obviously to be consumed in Korea. And there is no contention here that purely domestic trade was "restrained" in any way, or that prices in it were "enhanced" or "depressed."[4] Given the clarity of the statute, there is no need to resort to legislative history. *E. g.*, *Unexcelled Chemical Corp.* v. *United States*, 345 U. S. 59, 64 (1953).

But even the legislative history lends no support to the majority, and indeed leads to a contrary conclusion. The majority asserts that Congress thought it could increase American exports by ending competition for foreign shipments among American firms without impairing domestic competition. That is correct. Congress recognized that trade in foreign nations is not ringed about with the antitrust restrictions which keep domestic industry competitive. Congress found foreign trusts to have substantial advantages over their American competitors. They can offer to extend credit and fill large orders which no single American firm could fill; they can maintain staffs to keep in touch with foreign demand

---

[3] Indeed, even government statistics relating to balance of payments refer to shipments such as these as "exports." *E. g.*, Department of Commerce, Bureau of the Census, Statistical Abstract of the United States 1968, at 669, 801; 15 CFR § 30.1 *et seq.* (1968).

[4] § 2, 15 U. S. C. § 62.

more cheaply than any single American seller; and their advertising and distribution costs are generally lower than those of separate American firms.[5] Having made these findings, Congress concluded that American firms should be allowed to combine to achieve lower costs, lower prices, and more comprehensive and effective service, in order to be able to compete on an equal footing for foreign shipments.

In a transaction such as this, where American goods compete with foreign goods for foreign consumption, Congress had no objection to the formation of American associations to achieve lower prices and compete with foreign suppliers. That such competition was involved here is graphically illustrated by the fact that in most of the Korean purchases involved in this case [6] foreign bidders were successful in capturing at least part of the market, and the Government admits that foreign competition was never absent. It was precisely to enable American firms to meet such competition that the Webb-Pomerene Act was passed.

Moreover, it is no kindness to the American taxpayer to carve out an exception forbidding the formation of Webb-Pomerene associations in this case, given the assumptions on which the Act was passed. Congress specifically discussed phosphate as a commodity where American associations were necessary in order to achieve the savings and organization which would enable them to compete with foreign cartels in price and service.[7]

---

[5] See, e. g., S. Rep. No. 1056, 64th Cong., 2d Sess. (1917); H. R. Rep. No. 1118, 64th Cong., 1st Sess. (1916); Hearings on H. R. 17350 before the Senate Committee on Interstate Commerce, 64th Cong., 2d Sess., 44 (1917).

[6] Thirteen phosphate purchases were made by Korea, of which the Government challenges only the 11 to which the AID regulations apply. In those transactions alone, foreign bidders captured 18% of the business.

[7] 56 Cong. Rec. 110–111 (remarks of Senator Kellogg).

Without Webb-Pomerene associations, Congress concluded that American firms could not underbid their foreign competitors. Even in this case, with the Association bidding, foreign cartels captured 18% of the business. Under the majority opinion, American taxpayers would be paying out more American dollars to buy from foreign cartels goods which could have been obtained more cheaply from American associations employing American workers.

Congress explicitly found that Webb-Pomerene associations would lead to lower, not higher, prices in competition with foreign suppliers. It was on this basis that joint efforts by American companies in the export trade were exempted from the antitrust laws. Those charged with the duty faithfully to execute the laws should honor that exemption, not challenge it with facile assertions that the Act was "chauvinistic." Certainly this Court is not equipped or empowered to challenge either the exemption or the assumptions on which it rests.

To carve out an exception from the word "export" based on this Court's notions of sound economic policy is to contradict the plain words of the statute and the congressional judgment that American associations were necessary to lower prices and combat foreign competition. If such an exception were ever justified, it would be in a case where not only are Americans paying the bill, but also foreign competition is absent. This is not such a case.