**NEW JERSEY TURNPIKE AUTHORITY, a body corporate and politic of the State of New Jersey, Appellant,**

v.

**JERSEY CENTRAL POWER AND LIGHT and General Public Utilities Nuclear Corporation, Inc.**

No. 85–5131.

United States Court of Appeals, Third Circuit.

Argued April 30, 1985.

Decided Sept. 6, 1985.

As Amended Sept. 23, 1985.

---

John J. Barry (argued), Daniel D. Caldwell, Andrew J. Miller, Wolff & Samson, P.A., Roseland, N.J., for appellant.

Martin S. Siegel (argued), Edward K. Dehope, Susan K. Fischer, Riker, Danzig, Scherer & Hyland, Morristown, N.J., for appellee; Bishop, Liberman & Cook, New York City, of counsel.

Before GIBBONS and HIGGINBOTHAM, Circuit Judges, and NEWCOMER, District Judge *.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge:

We, like any other court, may lose jurisdiction over a case because of the occurrence of facts outside the record which terminate the controversy. We have constitutional jurisdiction only over actual cases and controversies between adverse interests, with respect to which our judgment will be effective. We find that the equitable remedy sought in this appeal from the district court's February 26, 1985 denial of injunctive relief is no longer available because of mootness.

The New Jersey Turnpike Authority initiated this action to enjoin a succession of overweight shipments of radioactive nuclear waste on a 28-mile stretch of the New Jersey Turnpike unless and until the defendant public utility complied with the New Jersey Turnpike Authority's condition that it provide a particularized backup vehicle to ensure the safe removal of the overweight load in the event of emergency. The district court denied the injunctive relief requested and restrained the New Jersey Turnpike Authority from interfering with the shipments.

During the pendency of this appeal, the six-month shipping campaign concluded thereby rendering, in our view, the New Jersey Turnpike Authority's injunction proceeding meaningless since the acts sought to be enjoined have irretrievably occurred. Because we believe that the controversy has become academic by reason of these changed circumstances, we conclude that our jurisdiction has ceased and the case is moot. We will vacate the decision of the district court and remand with directions to dismiss the action.

## I.

### A. Background—The NYSERDA Case

Defendant-appellee Jersey Central Power and Light ("JCP & L") is a public utility incorporated under the laws of the state of New Jersey and is the owner of the Oyster Creek Nuclear Generating Station ("Oyster Creek") located in Lacey Township, New Jersey.[1]

Pursuant to a 1975 contractual arrangement with Nuclear Fuel Services, JCP & L transported 224 spent fuel assemblies generated at Oyster Creek to the Western New York Nuclear Service Center for storage and reprocessing. The facility is owned by the New York State Energy Research and Development Authority ("NYSERDA"), and is located in West Valley, New York. In September of 1976, however, Nuclear Fuel Services withdrew from the reprocessing business and the 224 spent fuel assemblies were never reprocessed. They simply remained in storage in the West Valley storage pool.

Due to a dispute between NYSERDA and JCP & L and certain other public utilities storing fuel at the West Valley facility, NYSERDA commenced an action in the United States District Court for the Western District of New York entitled *New York State Energy Research and Development Authority v. Nuclear Fuel Services,*

---

* Honorable Clarence C. Newcomer, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

1. Oyster Creek is a federally licensed "utilization facility" as defined by the Atomic Energy Act of 1954 ("AEA"), 42 U.S.C. § 2014(cc) (1982) and, as such, is authorized to generate nuclear energy and also to receive and store on-site spent nuclear fuel ("spent fuel"). Spent fuel is radioactive material and constitutes "hazardous materials" as defined in the Hazardous Materials Transportation Act ("HMTA"), 49 U.S.C. § 1802(2) (1982).

JCP & L is a subsidiary of General Public Utilities ("GPU") as is General Public Utilities Nuclear ("GPUN"), also a defendant-appellee in this case.

*Inc.,* Civ. No. 82–426 (W.D.N.Y.) ("the NYSERDA case"). NYSERDA alleged liability for removal of the spent fuel stored at the disposal and reprocessing center. The district court ruled that JCP & L would be a trespasser if NYSERDA's unequivocal demand for removal was made and ignored. *New York State Energy Research and Development Authority v. Nuclear Fuel Services,* 561 F.Supp. 954 (W.D.N.Y.1983).

Subsequently, NYSERDA did make an unequivocal demand for removal of JCP & L's spent fuel. On September 30, 1983 NYSERDA and JCP & L entered into a partial settlement agreement which was later incorporated into the October 14, 1983 order directing JCP & L to commence the removal of its 225 spent fuel assemblies from West Valley by October 1, 1984 and complete removal by May 31, 1985.[2] The shipment of these 224 spent fuel assemblies from West Valley, New York to the Oyster Creek nuclear facility generated further proceedings in the United States District Court for the District of New Jersey,[3] including this appeal.

B. *New Jersey Turnpike Authority v. Jersey Central Power & Light and General Public Utilities Nuclear, et al., No. 85–5131*

("The NJTA Action")

To accomplish the shipment of its spent fuel within the agreed time frame set forth in the NYSERDA case, JCP & L calculated that it would have to make 32 shipments at the approximate rate of three shipments every two weeks. The spent fuel consisted of uranium dioxide pellets contained in long, sealed metal tubes, approximately fourteen feet in length and one-half of an inch in diameter. A bundle of these tubes, weighing about one-third of a ton, constitutes a "fuel assembly." To facilitate this shipping campaign, JCP & L contracted with Transnuclear, Inc. to provide specialized shipping casks and transportation services in order to ship the 224 spent fuel assemblies to Oyster Creek, and then return the empty casks to West Valley.

On September 26, 1984, JCP & L was notified that its proposed route for the return of the spent nuclear fuel to Oyster Creek was judged by the Nuclear Regulatory Commission ("NRC") to meet the regulatory requirements set forth in 10 C.F.R. § 73.37(b)(7). The NRC approved route included a 28-mile stretch on the New Jersey Turnpike ("the Turnpike"), Interstate 95, which is part of the Interstate Highway System, between Exits 10 and 7A.[4]

Each shipment (and each of the 32 return trips) was to be shipped in a special 80,000 pound TN–9 cask on a seven-axle vehicle—a four-axle tractor, three-axle trailer combination—weighing approximately 115,-

2. The United States District Court for the Western District of New York ordered the removal of JCP & L's spent fuel from West Valley in connection with the implementation by the United States Department of Energy of the West Valley Demonstration Project Act, Pub.L. No. 96–368, 92 Stat. 1347 (1980), which is designed to develop solutions to the nation's severe nuclear waste disposal problem.

The United States Department of Energy has taken possession of the West Valley facility for a demonstration project involving the preparation of radioactive waste for disposal. NYSERDA remains the owner. The West Valley Demonstration Project is intended to develop and demonstrate solidification techniques which can be used to prepare high-level radioactive waste for disposal in accordance with the policy objectives of the Nuclear Waste Policy Act of 1982, 42 U.S.C. §§ 10101–10226 (1982). The continued storage of the spent fuel rods at the West Valley facility impacted on the implementation of the West Valley Demonstration Project because completion of the project assumes removal of all spent fuel from the storage pool.

3. The transportation of the spent fuel in issue here has generated a related case: *Jersey Central Power & Light Company v. State of New Jersey and Irwin I. Kimmelman, as Attorney General, of the State of New Jersey,* No. 84–5883 ("The State Action"). The storage of the nuclear waste is the subject of dispute in *Jersey Central Power & Light Company v. the Township of Lacey,* Nos. 84–5652 and 84–5763 ("The Township of Lacey Action").

4. The route involved entering the state of New Jersey on Interstate 80 at the Delaware Water Gap. It then proceeded from Interstate 80 east to Interstate 287 south to the New Jersey Turnpike south to Interstate 95 east to Route 9 south into Oyster Creek.

000 pounds, which is nearly 50 percent greater than the 80,000 pound maximum permitted by federal law for the Interstate Highway System.[5] The power and responsibility to enforce this 80,000 pound limit has been delegated by the Federal Aid-Highway Act to the New Jersey Turnpike Authority ("NJTA").[6] The NJTA adopted the federal weight limitation by its own regulations, N.J.A.C. § 19:9–1.9(a)(12)(iv), pursuant to which it, as a matter of course, bars vehicles in excess of 80,000 pounds entirely.

The NJTA refused to issue a permit and/or other necessary approvals for shipment of the spent fuel along the portion of the Turnpike approved by the NRC unless certain conditions were met. As one condition for the issuance of a special permit, the NJTA required JCP & L to utilize a four-axle tractor for the shipments, which JCP & L agreed to do.[7] The NJTA also required that, prior to shipping the spent fuel on the Turnpike, JCP & L provide a backup four-axle tractor within sufficient proximity to permit safe removal of the overweight load from the Turnpike within two hours of any breakdown. Removal within two hours is specifically required by NJTA traffic control safety regulations, N.J.A.C. 19.9–1.6(f), but four-axle tractors are not readily available.[8] JCP & L apparently advised the NJTA that it would not or could not comply with the backup tractor condition.

On January 3, 1985, when the first shipment left West Valley, New York, the NJTA filed a verified complaint seeking to enjoin JCP & L from transporting the spent fuel unless and until it complied with the backup tractor condition. However, Judge Bissel concluded that the NJTA's backup tractor requirement was preempted by the Hazardous Material Transportation Act ("HMTA"), 49 U.S.C. §§ 1801–1812 (1982), because the requirement was not intended to enforce the federal weight restriction under the Federal Aid-Highway Act, 23 U.S.C. §§ 107–157 (1982), but instead imposed an additional equipment requirement due to the nuclear nature of the cargo, contrary to HMTA regulations. The district court denied the NJTA's motion for a stay pending appeal. When this Court declined to stay the district court's order pending appeal, the NJTA voluntarily dismissed its appeal.

The first shipment to Oyster Creek was accomplished without incident. However, hearings were later conducted on January 11, 1985 on the NJTA's refusal to permit the return shipments of the empty casks from Oyster Creek to West Valley. The district court determined that the return shipments were part of the entire shipping campaign and thus governed by the HMTA. On January 14, 1985, the district court ruled that the NJTA was similarly precluded from interfering with the return shipments. Judge Bissell's final judgment dismissing the NJTA's complaint and permanently enjoining the NJTA from interfering with the shipments was entered on February 26, 1985. He also denied the NJTA's motion for stay pending appeal and on March 1, 1985, the NJTA noticed this appeal.

---

**5.** The Federal Aid-Highway Act, 23 U.S.C. §§ 101–157 (1982), provides that "the maximum gross weight to be allowed by any State for vehicles using the National System of Interstate and Defense Highways ... may not exceed eighty thousand pounds ..." 23 U.S.C. § 127(a).

**6.** Exceptance to this weight limitation may be granted by "special permits [issued] in accordance with applicable State laws, or ... under law or regulations established by appropriate State authority ..." 23 U.S.C. § 127(a).

**7.** The NJTA undertook a study to determine whether and under what conditions such an

exception could be safely granted and concluded that the bridges and roads could accommodate the excess weight but only if the vehicle used was a four-axle tractor, three-axle trailer combination to fully distribute the weight of the load over a greater road surface.

**8.** Judge Bissel found that to accommodate this condition, JCP & L would need to lease such a vehicle on a standby basis for all spent fuel shipments and return shipments, with such vehicle being stored at the facility in Maryland, and at a cost of about $75,000. Appendix ("App.") at 156A.

## II.

This Court has been advised that this highly controversial shipping campaign concluded on July 9, 1985 and that the 224 spent fuel assemblies are presently being stored at the Oyster Creek nuclear facility.[9] Because the challenged activity has ceased, we must ask if there exists a "subject matter upon which the judgment of the court can operate" to make a substantive determination on the merits. *Ex Parte Baez,* 177 U.S. 378, 390, 20 S.Ct. 673, 677, 44 L.Ed. 813 (1900).[10] If one or more of the issues involved in an action become moot pending appeal or pending the decision of an appellate court, the adjudication of the moot issue or issues should be refused. Only where the remaining, non-mooted issues are sufficient so that the action retains its justiciability, may we then properly proceed to adjudication. *See United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947); 6A J. Moore, J. Lucas, G. Grother, Jr., Moore's Federal Practice ¶ 57.13 (2d ed. 1984).

The NJTA urges this court to reach the merits of this appeal on the theory that the issues presented in this case are "capable of repetition yet evading review." We decline to do so because we disagree that the first prong of this mootness exception has been satisfied. Although we recognize that the substantive issues are of considerable public interest, we believe that this alone does not impart Article III justiciability when there is "no reasonable expectation that the wrong will be repeated." *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953).

### A.

In 1895, the Supreme Court ruled that it would not pass upon a citizen's suit to compel registration for an election when the election was over. As to the importance of an effective remedy, the Supreme Court stated generally:

> The duty of this court, as of every other judicial tribunal, is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it. It necessarily follows that when, pending an appeal from the judgment of a lower court, and without any fault of the defendant, an event occurs which renders it impossible for this court, if it should decide the case in favor of the plaintiff, to grant him any effectual relief whatever, the court will not proceed to a formal judgment but will dismiss the appeal.

*Mills v. Green,* 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895); *See generally* Kates & Barker, *Mootness in Judicial Proceedings: Toward a Coherent Theory* 62 Cal.L.Rev. 1385, 1403 (1974) (lack of an effective remedy historically considered the central element of mootness).

Our impotence "to review moot cases [thus] derives from the requirement of Article III of the Constitution under which the exercise of our judicial power depends upon the existence of a case or controversy." *North Carolina v. Rice,*

---

**9.** We directed the parties to submit supplemental letter briefs filed after oral argument in response to our inquiry as to whether the 32 shipments had occurred and if so, whether this matter is rendered moot by the change in circumstances.

**10.** This court must address the question of mootness, although not raised by the parties, since this issue implicates our Article III jurisdiction. U.S. Const. art. III, § 2; *St. Paul Fire & Marine Ins. Co. v. Barry,* 438 U.S. 531, 537, 98 S.Ct. 2923, 2927, 57 L.Ed.2d 932 (1978); *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1,

7–8, 98 S.Ct. 1554, 1559, 56 L.Ed.2d 30 (1978). As we are required to do, we thus raise *sua sponte* whether the suit presents a live case or controversy. *C & C Products Inc. v. Messick,* 700 F.2d 635, 636 (11th Cir.1983).

*See also* our discussion of mootness in the related cases: *Jersey Central Power & Light Company v. Township of Lacey,* Nos. 84–5652 and 84–5763, and *Jersey Central Power & Light Company v. State of New Jersey and Irwin I. Kimmelman, as Attorney General of the State of New Jersey,* No. 84–5883.

404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971) (quoting *Liner v. Jafco, Inc.,* 375 U.S. 301, 306 n. 3, 84 S.Ct. 391, 394 n. 3, 11 L.Ed.2d 347 (1964)); U.S. Const. art. III, § 2.[11] The doctrine of mootness requires that "an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Steffel v. Thompson,* 415 U.S. 452, 459 n. 10, 94 S.Ct. 1209, 1213 n. 10, 39 L.Ed.2d 505 (1974); *Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 713, 35 L.Ed.2d 147 (1973); *Golden v. Zwickler,* 394 U.S. 103, 108, 89 S.Ct. 956, 959, 22 L.Ed.2d 113 (1969). Thus, mootness has two aspects: (1) the issues presented are no longer "live" or (2) the parties lack a cognizable interest in the outcome. *United States Parole Commission v. Geraghty,* 445 U.S. 388, 396, 100 S.Ct. 1202, 1208, 63 L.Ed.2d 479 (1980).

In this vein, we held in *Finberg v. Sullivan,* 658 F.2d 93, 97–98 (3d Cir.1980) (in banc), and reaffirmed in *Galda v. Bloustein,* 686 F.2d 159, 162–63 (3d Cir.1982):

> [a] case may become moot if (1) the alleged violation has ceased, and there is no reasonable expectation that it will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.

(quoting *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979)). *See also Hudson v. Robinson,* 678 F.2d 462 (3d Cir.1982).

■ Thus, a matter is not necessarily moot simply because the order attacked has expired; if the underlying dispute between the parties is one "capable repetition, yet evading review," it remains a justiciable controversy within the meaning of Article III. *Nebraska Press Association v.*

**11.** The Supreme Court first explicitly relied on Article III in *Liner v. Jafco, Inc.,* 375 U.S. 301, 306 n. 3, 84 S.Ct. 391, 394 n. 3, 11 L.Ed.2d 347 (1964). *See generally* Note, The Mootness Doctrine in the Supreme Court, 88 Harv.L.Rev. 373, 375 (1974) for a discussion of the elevation of mootness doctrine to constitutional status. *See also* 13 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 3533 (1975 & Supp. 1983) at 214–31 for an examination of the doctrinal foundations.

*Stuart,* 427 U.S. 539, 546, 96 S.Ct. 2791, 2797, 49 L.Ed.2d 683 (1976). The "capable of repetition yet evading review" exception is triggered where two elements are combined: (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party would be subjected to the same action again. *Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982) (per curiam); *Gannett Co. v. DePasquale,* 443 U.S. 368, 377, 99 S.Ct. 2898, 2904, 61 L.Ed.2d 608 (1979) (quoting *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975) (per curiam)); *Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).

■ Both of these conditions must be met if a case is to be saved from mootness. Therefore, even in injunction cases, the cessation of the conduct complained of makes the case moot if subsequent events make it clear that the wrongful behavior could not reasonably be expected to recur—even where the offending conduct, by its nature, evades review. *See, e.g., Vitek v. Jones,* 445 U.S. 480, 486–87, 100 S.Ct. 1254, 1260, 63 L.Ed.2d 552 (1980); *St. Paul Fire & Marine Ins. Co. v. Barry,* 438 U.S. 531, 538 n. 7 (1978); *United States v. Concentrated Phosphate Export Ass'n,* 393 U.S. 199, 203–04, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968); *W.T. Grant Co.,* 345 U.S. at 632–33, 73 S.Ct. at 897.

■ For purposes of our appellate review, the issue to be addressed is simply whether the district court's withholding of the injunctive relief sought by NJTA constituted an abuse of discretion. *National*

Several commentators and scholars also emphasize the mootness doctrine's implicit common law concern with the more practical considerations of judicial economy and political flexibility as distinct from the basic constitutional case or controversy requirements of Article III. *See, e.g.,* L. Tribe, American Constitutional Law § 3–17, at 68 (1978); Note, *supra* p. 379; Kates & Barker, Mootness in Judicial Proceedings: Toward a Coherent Theory, 62 Calif. L.Rev. 1385, 1401–35 (1974).

*Tank Truck Carriers v. Burke,* 608 F.2d 819, 823 (1st Cir.1979) (quoting *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 256, 45 L.Ed.2d 648 (1975)). We recognize that the performance of the particular acts sought to be enjoined in this case may moot the injunction issue, but if there is a likelihood that the acts complained of will be repeated, the substantive issues remain justiciable, and a declaratory judgment could be rendered to define the rights and obligations of the parties. *See, e.g., Concentrated Phosphate,* 393 U.S. at 203–04, 89 S.Ct. at 364; *United States v. Munsingwear,* 340 U.S. 36, 39, 71 S.Ct. 104, 106, 95 L.Ed. 36 (1950). The substantive issue presented by NJTA's request for the injunction prohibiting the shipments is whether the backup tractor condition it imposed pursuant to its regulation, as predicated on federal law, was inconsistent with the HMTA. The NJTA, however, remains obligated to satisfy this Court that relief is needed because of "some cognizable danger of recurrent violation", something more than the mere probability which serves to keep the case alive. *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 59–60 (1975); *W.T. Grant Co.,* 345 U.S. at 633, 73 S.Ct. at 898. We cannot decide the substantive issue if we can afford the complaining party no effectual relief.

We think that the Supreme Court's analysis in *Murphy* provides the appropriate analytical framework for examining the condition we find lacking here—a reasonable expectation that the complaining party, NJTA, will again be embroiled in the same controversy.

*Murphy* involved a state criminal defendant denied pretrial bail, under a provision of the Nebraska Constitution prohibiting bail in cases involving violent sexual offenses. His civil rights action challenging the constitutionality of the provision and seeking declaratory and injunctive relief reached the Supreme Court after he had been tried and convicted. After holding that the conviction mooted his claim, as he had neither prayed for damages nor sought to represent a class of pretrial detainees, the Supreme Court considered whether the "capable of repetition, yet evading review" exception might apply.

It defined "capable of repetition" as requiring "a *'reasonable expectation'* or a *demonstrated probability* that the *same controversy* will occur involving the *same complaining party.*" 455 U.S. at 482, 102 S.Ct. at 1183 (citation omitted) (emphasis added), and found it lacking as to Murphy's contention that his conviction might be overturned, in which case he might again seek pretrial bail. With nothing on the record to suggest the likelihood of reversal of all three of his convictions on appeal, the possibility was purely speculative and thus insufficient to trigger the exception. 455 U.S. at 483, n. 7, 102 S.Ct. at 1184, n. 7. In so holding, the Supreme Court stressed that it had "never held that a mere physical or theoretical possibility was sufficient to satisfy the [capable of repetition] test ... If this were true, virtually any matter of short duration would be reviewable." 455 U.S. at 482, 102 S.Ct. at 1183.[12]

**12.** Although *Murphy* arose in a criminal context, the criteria it articulates apply in civil actions as well. *See United States v. Frumento,* 552 F.2d 534 (3d Cir.1977).

The most important ingredient in those cases found to be exceptions to the mootness doctrine under this particular exception is not economic concern, *see, e.g., Jacksonville Bulk Terminals v. International Longshoremen's Association,* 457 U.S. 702, 704, 102 S.Ct. 2672, 2676, 73 L.Ed.2d 327 (1982); *Super Tire Engineering Co. v. McCorkle,* 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974) (cases in which Supreme Court rejected suggestion of mootness despite fact underlying labor dispute had ended), or personal injury at stake, *see, e.g., Roe v. Wade.* The

important ingredient in these cases was governmental action directly affecting and continuing to affect, the behavior of citizens in our society. *Frumento,* 552 F.2d at 539.

The two-pronged test may have been "relaxed" previously in those instances in order to give *private plaintiffs* sufficient stake to challenge governmental activity that may recur without requiring proof of a certainty that they will then be affected, so long as the activity is likely otherwise to evade review. As the Supreme Court stated, "the litigant must show the existence of an immediate and definite governmental action or policy that has adversely affected and continues to affect a present interest." *Super Tire Engineering,* 416 U.S. at 126–27, 94 S.Ct.

■ *Murphy* thus requires us to determine whether there is a "demonstrated probability", or a "reasonable expectation," as distinct from a "mere physical or theoretical possibility," that the conduct of which NJTA complains will recur thereby keeping this matter susceptible to judicial resolution. We detect no such level of probability in this case.

### B.

There is no dispute that the NJTA has the authority to issue special permits for the passage of overweight loads by virtue of the Federal Aid-Highway Act. In so exercising this delegated discretion, the NJTA sought to preclude JCP & L from shipping the 224 spent fuel assemblies via the Turnpike unless and until it complied with the four-axle backup tractor condition. The conduct complained of was JCP & L's failure to comply with a specific condition necessarily predicated on the *unique* features of this particular series of shipments.

The condition triggering the offending conduct, and NJTA's lawsuit, being so fact-specific, we would have to assume a "demonstrated probability" of the following in order to find the instant controversy "capable of repetition:" First, a reasonable expectation that JCP & L will attempt another *overweight* shipment of hazardous materials from a geographic reference point north of its Oyster Creek facility, necessitating the submission of a proposed route to the NRC via the New Jersey Turnpike. Second, a reasonable likelihood that the NRC would approve shipment over the New Jersey Turnpike, as opposed to another Interstate route, in order to bring into play the question of the NJTA's authority under the Federal Aid-Highway Act and the HMTA. Third, a reasonable probability that JCP & L would choose to employ a four-axle tractor, three-axle trailor combination thereby rendering the NJTA's usual emergency equipment—a three-axle trac-

tor—ineffective in the event removal of the load from the Turnpike is required. Fourth, a reasonable expectation that the NJTA would issue a special permit for this overweight load—again departing from its usual course—*and* that it would condition the required permit on the proximity of a backup, four-axle tractor. Finally, a reasonable probability that JCP & L would refuse to comply with the condition—the offending conduct here—thusly, shipping in disregard of the NJTA's requirements.

Nothing on this record apprises us of the likelihood of a similar chain of events, even were we to refrain from such a fact-specific digression. The NJTA "anticipates future shipments of a similar nature" because "we live in a nuclear age" which gives rise to more frequent nuclear shipments in larger trucks. The only support for this statement is the unsubstantiated assertion that "[b]ecause the motiviation for employing overweight vehicles is principally an economic one, there is little doubt that shippers of highly radioactive cargo will continue to use overweight vehicles." August 1, 1985 Letter of Counsel at 2. From this generalization, however, we can fathom no "demonstrated probability" or "reasonable expectation" that the offending conduct will recur, but only the "theoretical possibility" rejected by the Supreme Court in *Murphy.*

■ It is the burden of the moving party to establish that the issue is "capable of repetition yet evading review." "Capable of repetition" is not a synonym for "mere speculation;" it is a substantive term on which the moving party must provide a reasonable quantity of proof—perhaps even by the preponderance of the evidence. It is at this critical evidentiary juncture where the NJTA fails.

We know that in 33 shipments JCP & L has removed all 224 spent fuel assemblies from the West Valley, New York facility and they are currently being stored at the

at 1700–01. *See, e.g., Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911). But *Murphy* seems to impart the more generalized approach for determining whether the adversity thought essential to full litigation under Article III remains intact despite intervening events.

Oyster Creek nuclear reactor. JCP & L was under a court order to remove those rods and the order has been complied with. Moreover, given present use of the facility to promote the West Valley Demonstration Project, we consider it unlikely that JCP & L will be transporting any radioactive materials from West Valley, New York to its Oyster Creek facility. There has been no evidence placed in the record that these rods will again be transported away from their present resting place.

Additionally, the route selected is not one solely left to the behest of the shippers. There is the added factor that the NRC has to approve the route for transportation and, as borne out in the related case *Jersey Central Power & Light Company v. State of New Jersey, et al.*, No. 84–5883, independent agencies within New Jersey can designate alternate routes. So, merely because the Turnpike is frequently traversed as a general matter does not mean it will constantly be the optimal route selected by the NRC or other states involved in the transport of hazardous materials. No evidence has been placed in the record that the NRC has been petitioned to transport hazardous materials of the weight and magnitude of the rods in issue.

Furthermore, these overweight casks were specially designed and necessitated a vehicle of certain proportion for transport, the salient fact which made the imposition of the back up tractor pertinent. The allegation of a generalized economic motivation to haul in overweight vehicles does not amount to a reasonable expectation that this is likely to be the norm. As alleged by NJTA in its complaint, the "major concern regarding the shipping vehicle is over lack of provisions to handle a mechanical disablement of the tractor trailer carrying the cask." Appendix ("App.") at 2204–21A. NJTA itself alleged that the four-axle tractor utilized by JCP & L was not a common vehicle, app., at 221A, which, in our view, is also indicative of the special nature of this shipment and hence the perceived necessity for imposing the condition. No evidence has been put in the record to establish that in the future rods of this size and weight will be transported on the New Jersey Turnpike under similar conditions.

In the absence of such affirmative evidence, we are asked to speculate as to an event that the NJTA has not proven that there is a reasonable expectation of repetition.

■ The "capable of repetition, yet evading review" exception being inapposite, we can reach no other conclusion than that this case is moot. Given the fact that NJTA has not sought damages, but only injunctive relief, it retains no legally cognizable interest in the case. Under these circumstances, a judgment favorable to NJTA would do no more than entitle it to require JCP & L to comply with a fact-specific condition imposed upon a unique, completed shipment, and so constitute an advisory opinion prohibited by Article III.

### III.

■ While we have lost jurisdiction over the substance of this appeal, we nevertheless retain authority to fashion a decree clarifying the effect of the mootness on the district court's initial determination. We will vacate the district court's decision and remand with directions to dismiss the action in order to strip the decision of legal consequences. *Munsingwear*, 340 U.S. at 40–41. We do so because

> it clears the path for future relitigation of the issues between the parties and eliminates a judgment, review of which was prevented through happenstance. When that procedure is followed, the rights of all parties are preserved …

*Id.; See generally*, Greenbaum, *Mootness on Appeal in Federal Courts: A Reexamination of the Consequences of Appellate Disposition*, 17 U.C. Davis L.Rev. 7–102 (Fall 1983).

Accordingly, we will vacate the judgment of the district court and remand this matter to the district court for further proceedings consistent with this opinion.