NEW YORK STATE NATIONAL ORGA-
NIZATION FOR WOMEN; New York
City Chapter of the National Organiza-
tion for Women; National Organization
for Women; Religious Coalition for
Abortion Rights–New York Metropoli-
tan Area; New York State National
Abortion Rights Action League, Inc.;
Planned Parenthood of New York City,
Inc.; Eastern Women's Center, Inc.;
Planned Parenthood Clinic (Bronx);
Planned Parenthood Clinic (Brooklyn);
Planned Parenthood Margaret Sanger
Clinic (Manhattan); Ob–Gyn Pavilion;
The Center for Reproductive and Sexual
Health; VIP Medical Associates; Bill
Baird Institute (Suffolk); Bill Baird In-
stitute (Nassau); Dr. Thomas J. Mullin
Bill Baird; Reverend Beatrice Blair;
Rabbi Dennis Math; Reverend Donald
Morlan; and Pro–Choice Coalition,
Plaintiffs,

and

City of New York, Plaintiff–Intervenor,

v.

Randall A. TERRY; Operation Rescue;
Reverend James P. Lisante; Thomas
Herlihy; John Doe(s) and Jane Doe(s),
the last two being fictitious names, the
real names of said defendants being
presently unknown to plaintiffs, said fic-
titious names being intended to desig-
nate organizations or persons who are
members of defendant organizations,
and others acting in concert with any of
the defendants who are engaging in, or
intend to engage in, the conduct com-
plained of herein, Defendants.

No. 88 Civ. 3071 (RJW).

United States District Court,
S.D. New York.

Jan. 17, 1997.

Corporation Counsel of the City of New York, New York City (Hillary Weisman, of counsel), for Plaintiff–Intervenor.

McCarthy & Secola, P.C., New Milford, CT (Joseph P. Secola, of counsel), Legal Center for the Defense of Life, New York City (Michael P. Tierney, of counsel), Bleakley Platt & Schmidt, White Plains, NY (William P. Harrington, of counsel), Morgan & Finnegan, L.L.P., New York City (John F. Sweeney, Gabriel P. Kralik, Michael O. Cummings, of counsel), A. Lawrence Washburn, New York City, for Defendants.

## OPINION

ROBERT J. WARD, District Judge.

Plaintiffs move pursuant to Rule 43 of the Civil Rules for the Southern and Eastern Districts of New York ("Local Rule 43") for an order reinstating this Court's May 10, 1990 Order adjudging defendants in contempt and imposing noncompensatory sanctions on defendants, subject to an opportunity for defendants to purge themselves of contempt. In addition, plaintiffs move pursuant to 42 U.S.C. § 1988, Rule 54, Fed. R.Civ.P., and Local Rule 43 for an order reinstating this Court's July 9, 1990 Order awarding plaintiffs attorneys' fees incurred in bringing a motion for contempt and as prevailing parties on their civil rights claims. For the reasons that follow, plaintiffs' motion is granted.

## BACKGROUND

Plaintiffs commenced this action in the Supreme Court of the State of New York on April 25, 1988, seeking injunctive and declaratory relief to restrain defendants from blocking access to medical facilities providing abortions. The action was brought in response to defendants' plan to carry out a week of protests, denominated "Operation Rescue," at area abortion clinics from April 30 until May 7, 1988. In furtherance of their plan, defendants attempted to prevent abortions by converging on a different clinic or facility each day. The target facility was not to be disclosed in advance.

Morrison & Foerster, New York City (James A. Bergin, Jamie A. Levitt, of counsel), Now Legal Defense and Education Fund, New York City (Deborah Ellis, Rocio Cordoba, of counsel), Center for Constitutional Rights, New York City (Barbara Olshansky, of counsel), for Plaintiffs.

By order to show cause, plaintiffs sought to enjoin defendants, for the duration of the planned "Operation Rescue," from obstructing access to medical facilities performing abortions in New York City and the surrounding counties. On April 28, 1988, Justice Cahn of the Supreme Court, New York County, issued a temporary restraining order ("TRO"). Having been assured by the New York City Police Department that access to the clinics would be provided, Justice Cahn did not expressly enjoin Operation Rescue from blocking access to health care facilities performing abortions.

Despite the assurances of the police department, on May 2, 1988, 503 protestors succeeded in blockading the office of a Manhattan doctor who performed abortions at 154 East 85th Street. All of the protestors were arrested. On the afternoon of May 2, 1988, Justice Cahn issued a second TRO, which enjoined defendants from "trespassing on, blocking, obstructing ingress into or egress from any facility at which abortions are performed in the City of New York, Nassau, Suffolk or Westchester Counties from May 2, 1988 to May 7, 1988."

Despite the order, defendant Randall Terry ("Terry") led a demonstration in front of a Queens facility where abortions were performed on May 3, 1988. During the demonstration, in which protestors blocked ingress into and egress from the facility, several hundred demonstrators were arrested. Later that afternoon, Justice Cahn conducted a hearing on the matter, during which defendants removed the action to this Court. A hearing before this Court was scheduled for May 4, 1988.

At that hearing, the Court decided that it would adopt and continue Justice Cahn's May 2, 1988 TRO, modifying it by (1) adding coercive sanctions of $25,000 for each day that defendants violated the terms of the order, and (2) requiring defendants to notify the City in advance of the location of any demonstrations. On May 5, 1988, Operation

Rescue conducted a demonstration in front of the Women's Choice Clinic in Hicksville, Long Island, a facility where abortions are performed. Protestors sat on the sidewalk in front of the clinic, blocking ingress into and egress from the clinic for three hours.

On May 6, 1988, Operation Rescue demonstrators returned to the East 85th Street office of the doctor who performed abortions. Terry personally participated in this protest, during which demonstrators blocked access to the office. As a result of the May 6, 1988 demonstration, 320 Operation Rescue protestors, including Terry, were arrested.

Following the events of May 5 and 6, 1988, and in accordance with the TRO, plaintiffs filed a motion seeking civil contempt sanctions against Operation Rescue and Terry. By Opinion dated October 27, 1988 ("the October 27 Opinion"), the Court granted the motion, denied defendants' cross-motion to dismiss, and adjudged Terry and Operation Rescue in civil contempt of the May 4 Order for their participation in the May 5 and May 6 demonstrations. *N.O.W. v. Terry*, 697 F.Supp. 1324, 1338 (S.D.N.Y.1988). A judgment was entered holding Terry and Operation Rescue jointly and severally liable for $50,000 in civil contempt sanctions, payable to the National Organization for Women ("N.O.W.").[1]

On October 7, 1988, plaintiffs moved to modify the Court's prior order to cover the dates October 28, 29, and 31, 1988, in response to defendants' publicized plan to conduct a "National Day of Rescue" at the end of October. The Court granted plaintiffs' motion after an evidentiary hearing, converting the TRO to a preliminary injunction on October 27, 1988 (the "Preliminary Injunction"). Defendants' applications to this Court and the Court of Appeals for a stay pending appeal of the Preliminary Injunction were denied. In spite of this, defendants proceeded with their plan, conducting two demonstrations on October 29, 1988 within

---

1. This order was ultimately modified by the Second Circuit, which directed that the sanctions be paid into Court "[i]nasmuch as no proof of loss was offered on behalf of N.O.W., no evidence of actual injury due to Operation Rescue's activities was shown and there was no evidence that awarding the contempt sanction to N.O.W. would have additional coercive effect on defendant's behavior." *N.O.W. v. Terry*, 886 F.2d 1339, 1354 (2d Cir.1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990).

the geographical area covered by the Preliminary Injunction.

One demonstration was held at the Women's Pavilion medical clinic in Dobbs Ferry, New York. Between 8 a.m. and 12:15 p.m., 250 Operation Rescue protestors blocked ingress into and egress from the clinic. During those same hours, 130 protestors blocked access to the Women's Pavilion clinic in Deer Park, New York. All 130 participants in the Deer Park blockade were arrested. Both clinics provide abortions and family planning counseling.

In retaliation for the Court's October 27, 1988 Opinion, Operation Rescue organized blockades of abortion providers in the New York City area from January 12 through January 14, 1989. *N.O.W. v. Terry,* 732 F.Supp. 388, 395 (S.D.N.Y.1990). Upon learning of Operation Rescue's plan, plaintiffs moved the Court for summary judgment on their claims under 42 U.S.C. § 1985(3) and state law, and for a permanent injunction on December 21, 1988. The Court heard oral argument on January 6, 1989. On January 10, 1989, the Court entered a permanent injunction ("the Permanent Injunction"), enjoining defendants from, among other things,

> trespassing on, blocking, or obstructing ingress into or egress from any facility at which abortions are performed in the City of New York, Nassau, Suffolk or Westchester counties [and] physically abusing or tortiously harassing persons entering, leaving, working at, or using any services at any facility at which abortions are performed in the City of New York, Nassau, Suffolk, or Westchester Counties.

The injunction contained provisions limiting defendants' First Amendment right to sidewalk counsel. It also provided that defendants would be fined for failing to give the City of New York advance notice of any demonstrations.

In addition, the Permanent Injunction set out a schedule of sanctions for future violations. The Court ordered that

> the failure to comply with th[e] Order by any Operation Rescue participant with actual notice of the provisions of th[e] Order shall subject him or her to civil damages of $25,000 per day for the first violation of th[e] Order; and ... further ordered that each successive violation of th[e] Order shall subject the contemnor to a civil contempt fine double that of the previous fine; and ... further ordered that any amounts collected thereunder shall be paid into the Registry of the Court to be disbursed by further Order of the Court; and ... further ordered that each contemnor shall be jointly and severally liable for all attorneys' fees and related costs incurred by plaintiffs in relation to enforcement of th[e] Order ...

In crafting the Permanent Injunction, the Court reasoned that "[i]n view of defendants' past non-compliance with the Court's injunctive orders and their stated intention to block access to clinics without regard to any order issued by the Court, the Court considers it necessary to impose prospective civil contempt penalties in order to enforce compliance with its injunction." *N.O.W. v. Terry,* 704 F.Supp. 1247, 1263 (S.D.N.Y.1989). The January 20, 1989 Opinion of this Court granting plaintiffs summary judgment and permanent injunctive relief was upheld by the Second Circuit in a decision dated September 20, 1989. *N.O.W. v. Terry,* 886 F.2d 1339 (2d Cir.1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990) (*"Terry I "*).[2]

In subsequent contempt proceedings, defendants and several non-party respondents acting in concert with the defendants[3] were found to have violated the Permanent Injunction, and the TRO and preliminary injunction that preceded it, by blockading facilities

---

**2.** As part of this consolidated appeal, the Second Circuit also affirmed earlier interlocutory decisions imposing contempt sanctions against defendants Terry and Operation Rescue, and imposing discovery sanctions on Terry. *N.O.W. v. Terry,* 886 F.2d at 1353.

**3.** Under Rule 65(d), Fed.R.Civ.P., civil contempt sanctions may be assessed against nonparties who had actual notice of the order in effect at the time in question and who acted in concert with defendants in violating the order. In this Opinion, defendants and the non-party respondents adjudged in contempt will at times be collectively referred to as "defendants."

where abortions were performed on four separate dates: May 6, 1988, October 29, 1988, January 13, 1989, and January 14, 1989. *N.O.W. v. Terry,* 732 F.Supp. 388, 398 (S.D.N.Y.1990). The undisputed facts established, by clear and convincing evidence, that each of the following defendants and non-party respondents had violated the Permanent Injunction and/or the injunctive orders that preceded it. *Id.* They were held in civil contempt and the following sanctions were levied against them:

| Defendant | Contumacious Behavior and Sanction |
| --- | --- |
| Randall Terry and Operation Rescue | A total of $100,000 in sanctions, joint and severally, derived as follows: (1) $25,000 for the demonstrations in violation of the October 27 Order at the Women's Pavilion Clinics in Deer Park and Dobbs Ferry, New York on October 29, 1988; (2) $25,000 for the demonstration in violation of the Permanent Injunction at the Margaret Sanger Clinic on January 13, 1989; and (3) $50,000 for the demonstrations in violation of the Permanent Injunction at six New York City area clinics on January 14, 1989. |
| Thomas Herlihy | Fined $25,000 for violating the May 4, 1988 Order by participating in a May 6, 1988 demonstration and blocking access to the office of a physician who performed abortions. |

| Non–Party Respondent | Contumacious Behavior and Sanction |
| --- | --- |
| B.O.R.N. | Fined $25,000 for violating the October 27, 1988 Order by sponsoring and participating in demonstrations in Deer Park and Dobbs Ferry, New York on October 29, 1988. |
| Jesse Lee | Fined a total of $100,000, derived as follows: (1) $25,000 for the demonstration in Dobbs Ferry, New York on October 29, 1988 in violation of the October 27, 1988 Order; (2) $25,000 for the demonstration in violation of the Permanent Injunction at the Margaret Sanger Clinic on January 13, 1989; (3) $50,000 for the demonstration in violation of the Permanent Injunction at the VIP Medical Associates Clinic in Manhattan on January 14, 1989. |
| Joseph Foreman, Michael McMonagle, and Jeff White | Each fined $25,000 for their participation in the January 13, 1989 demonstration at the Margaret Sanger Clinic in violation of the Permanent Injunction. |
| Michael La Penna | Fined $25,000 for blocking access to the Women's Pavilion Clinic in Deer Park, New York on October 29, 1988 in violation of the October 27, 1988 Order. |
| Florence Talluto | Fined $50,000 derived as follows: (1) $25,000 for blocking access to the V.I.P. Clinic in Manhattan on January 14, 1989 in violation of the Permanent Injunction; and (2) $25,000 for her participation in the Deer Park demonstration on October 29, 1988 in violation of the October 27, 1988 Order. |
| Adelle Nathanson | Fined $25,000 for blocking access to the Women's Pavilion Clinic in Dobbs Ferry, New York on October 29, 1988 in violation of the October 27, 1988 Order. |
| Robert Pearson | Fined $25,000 for blocking access to the V.I.P. Clinic in Manhattan on January 14, 1989 in violation of the Permanent Injunction. |

In a later decision, the Court awarded plaintiffs attorneys' fees as prevailing parties on their civil rights claim and for prosecuting the motion for contempt. *N.O.W. v. Terry,* 737 F.Supp. 1350 (S.D.N.Y.1990). In a consolidated appeal, all but two of the judgments of contempt [4] and the award of attorneys' fees were affirmed by the Second Circuit. *N.O.W. v. Terry,* 961 F.2d 390 (2d Cir.1992) (*"Terry II"*).

Defendants petitioned for a writ of certiorari based on the Supreme Court's grant of certiorari in *Bray v. Alexandria Women's Health Clinic,* 498 U.S. 1119, 111 S.Ct. 1070, 112 L.Ed.2d 1176 (1991). The Supreme Court granted certiorari and vacated the judgment in a memorandum decision, remanding the case to the Court of Appeals for the Second Circuit for further consideration in light of *Bray,* 506 U.S. 263, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993). *Pearson v. Planned Parenthood Margaret Sanger Clinic (Manhattan),* 507 U.S. 901, 113 S.Ct. 1233, 122 L.Ed.2d 640 (1993).

On remand, the Court of Appeals reinstated its initial judgment, reasoning that "reconsideration of the contempt sanctions litigated on this appeal should be addressed in the first instance to the district court." *N.O.W. v. Terry,* 996 F.2d 1351, 1352 (2d Cir.1993) (*"Terry III"*). Again appellants sought a writ of certiorari, arguing that the contempt sanctions imposed in this case were criminal in nature and presented the same issue which was then before the Supreme Court in *International Union, United Mine Workers of America v. Bagwell,* 512 U.S. 821, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994). In their petition for a writ of certiorari, appellants also reiterated their argument that the Supreme Court's decision in *Bray* required reversal of this Court's judgment in *Terry I.* Certiorari was granted, and again the deci-

---

4. The judgments of contempt against respondents Talluto and La Penna were reversed on the ground that this Court lacked jurisdiction over them due to improper service of the Order to Show Cause. *N.O.W. v. Terry,* 961 F.2d at 400.

sion of the Court of Appeals was vacated and remanded, this time, for further consideration in light of *Bagwell,* 512 U.S. 821, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994). *Pearson v. Planned Parenthood Margaret Sanger Clinic (Manhattan),* 512 U.S. 1249, 114 S.Ct. 2776, 129 L.Ed.2d 888 (1994). In its second memorandum decision, the Supreme Court did not discuss appellants' request for reversal of *Terry I* based upon *Bray.*

On remand, a panel of the Court of Appeals for the Second Circuit vacated this Court's levy of noncompensatory fines [5] and remanded the case for further proceedings consistent with the Supreme Court's decision in *Bagwell. N.O.W. v. Terry,* 41 F.3d 794 (2d Cir.1994) *("Terry IV").* Since it had vacated the judgments of contempt, the Second Circuit likewise vacated the award of attorneys' fees for prosecuting the motion for contempt. *Id.* at 797. Despite the Supreme Court's silence on this point, the panel also instructed this Court to reconsider its award of attorneys' fees under 42 U.S.C. § 1988 in light of *Bray,* 506 U.S. 263, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993). *Id.*[6]

Accordingly, plaintiffs now move the Court: 1) for an order, pursuant to Local Rule 43, reinstating the Court's May 10, 1990 Order adjudging defendants in contempt and imposing noncompensatory sanctions on defendants, subject to an opportunity for defendants to purge themselves of contempt; and 2) for an order pursuant to 42 U.S.C. § 1988, Rule 54, Fed.R.Civ.P., and Local Rule 43, reinstating this Court's July 9, 1990 Order awarding plaintiffs attorneys' fees for bringing a motion for contempt and as prevailing parties on their civil rights claim.

## DISCUSSION

The prospective noncompensatory fines levied against defendants can be reinstated only if they comport with the restrictions on noncompensatory sanctions for indirect contempts set out by the Supreme Court in *Bagwell.* Because the Court directs the par-

ties to settle on notice a Modified Permanent Injunction that includes a provision whereby contemnors may purge themselves of a contempt of the injunction, bringing the schedule of prospective sanctions into conformity with *Bagwell,* the fines will be reinstated. Since the fines are hereby reinstated, the award of attorneys' fees for prosecution of the contempt motion will stand. Additionally, the Court finds that *Bray* does not require that the award of attorneys' fees to plaintiffs as prevailing parties on their civil rights claims be vacated. The Court will first address defendants' argument that the Court lacks jurisdiction to hear the motions on mootness grounds. Next the Court will discuss the reinstatement of noncompensatory sanctions against defendants and finally, will turn to the award of attorneys' fees.

### I. *Mootness*

■ Before reaching the merits of plaintiffs' motions, the Court will briefly address defendants' argument that this Court lacks jurisdiction to entertain the motions because the case has been rendered moot. Defendants contend that there is no longer a live controversy in this case due to the lack of violations of the Permanent Injunction over the past seven years and the enactment of the Freedom of Access to Clinic Entrances Act of 1994, 18 U.S.C. § 248 (1994) ("FACE"). On those same grounds, defendants cross-move for vacatur of the Permanent Injunction.

Had this case indeed become moot, defendants would be entitled to dismissal as a matter of right. *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953) (citation omitted). Defendants argue that

> [w]hen a defendant has voluntarily ceased activity sought to be enjoined, the action becomes moot when two conditions are met: 1) where "it can be said with assurance that 'there is no reasonable expectation' that the alleged violation will recur,"

---

5. This Court's decision is reported at 732 F.Supp. 388 (S.D.N.Y.1990).

6. The decision of this Court awarding plaintiffs attorneys fees for prosecuting the motion for

contempt and as prevailing parties on their civil rights claim is reported at 737 F.Supp. 1350 (S.D.N.Y.1990).

and 2) where "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."

Defs.' Mem. in Opp. at 23 (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979) (citations omitted)). As noted by the Supreme Court, "[i]n seeking to have a case dismissed as moot, however, the defendant's burden 'is a heavy one.'" *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 66, 108 S.Ct. 376, 386, 98 L.Ed.2d 306 (1987) (quoting *W.T. Grant Co.*, 345 U.S. at 633, 73 S.Ct. at 897). Under *Gwaltney*, a "defendant must demonstrate that it is 'absolutely clear' that the allegedly wrongful behavior could not reasonably be expected to recur.'" 484 U.S. at 66, 108 S.Ct. at 386 (quoting *United States v. Concentrated Phosphate Export Ass'n, Inc.*, 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968)).

The Court does not believe defendants have met their burden, and fails to see how it can be said with any assurance that there is no reasonable expectation that the violations here will recur. This is especially true since defendants have never agreed to abide by the Permanent Injunction. Defendants argue that the seven years that have passed without their violating the injunction provide that expectation. Further, they contend that for the case to withstand a mootness challenge, plaintiffs must come forward with evidence showing that defendants intend further rescues. *Gwaltney*, however, makes clear that the burden of showing mootness rests squarely on defendants' shoulders. Defendants are always "free to return to [their] old ways." *W.T. Grant Co.*, 345 U.S. at 632, 73 S.Ct. at 897. Indeed, plaintiffs assert that, in the event defendants file a motion to dismiss, they stand ready to "show that reproductive health clinics in New York City continue to experience frequent demonstration activity, including harassment of clinic staff and physical obstruction of patients' access to reproductive health services." Pls.' Reply Mem. at 22, n. 15. Thus, it has not

been made "absolutely clear" that violations are unlikely to recur.

Nor is the Court persuaded that the enactment of FACE renders this case moot, or militates that the Permanent Injunction be dissolved. The statute itself states that it shall not be construed "to provide exclusive criminal penalties or civil remedies with respect to the conduct prohibited by this section." 18 U.S.C. § 248(d)(3). Therefore, it is not inconsistent with the Act for the Permanent Injunction herein to provide victims of abortion clinic blockades with additional or alternative remedies. As an alternative remedy, FACE cannot constitute an interim event that completely and irrevocably eradicates the effects of defendants' violations.

Neither the passage of time without violation, nor the enactment of FACE renders the Permanent Injunction moot, divesting this Court of jurisdiction. Thus, the Court will proceed to consider the merits of plaintiffs' motions.

## II. *The Motion for Reinstatement of Noncompensatory Sanctions*

That defendants and non-party respondents violated the series of injunctive orders entered in this case has not been disputed.[7] Rather, the issue on remand is the nature of the remedy awarded in this case; particularly, whether the sanctions imposed for indirect contempts of the Permanent Injunction and the injunctive orders that preceded it are criminal in nature, requiring constitutional criminal procedural protections.

■ While compensatory fines paid to the aggrieved party have traditionally been viewed as remedial sanctions for civil contempt, noncompensatory fines paid into the court are generally seen as punitive sanctions to vindicate the authority of the court, requiring the constitutional protections attendant to criminal process. *Hicks v. Feiock*, 485 U.S. 624, 632, 108 S.Ct. 1423, 1429–30, 99 L.Ed.2d 721 (1988). A noncompensatory

---

7. "No facts were disputed by any of defendants, nor by respondents B.O.R.N., Lee, Foreman, McMonagle, White, La Penna and Talluto." 732 F.Supp. at 396. Only respondents Adelle Nathanson and Robert Pearson disputed having

knowledge of the Court's orders and blocking access to the clinics. After an evidentiary hearing, the Court found by clear and convincing evidence that they had knowingly violated the order and adjudged them in civil contempt. *Id.*

sanction imposed to coerce compliance with a court order, however, may be considered civil if the contemnor is given an opportunity to purge himself of the contempt. *United States v. United Mine Workers of America,* 330 U.S. 258, 305, 67 S.Ct. 677, 702, 91 L.Ed. 884 (1947). Civil contempt sanctions "are considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard." *International Union, Mine Workers of America v. Bagwell,* 512 U.S. 821, 827, 114 S.Ct. 2552, 2557, 129 L.Ed.2d 642 (1994).

■ Since the fines imposed pursuant to this Court's 1990 Order adjudging defendants and non-party respondents in contempt were non-compensatory, the Second Circuit has remanded the case for a determination as to whether they comport with the Supreme Court's 1994 ruling in *Bagwell.* In that case, the Supreme Court imposed "procedural burdens on courts' ability to sanction widespread, indirect contempts of complex injunctions through noncompensatory fines." *Id.* at 838, 114 S.Ct. at 2563.

*Bagwell* involved a labor dispute during which striking members of the United Mine Workers violated an injunction prohibiting them from "obstructing ingress and egress to company facilities, throwing objects at and physically threatening company employees, placing tire-damaging 'jackrocks' on roads used by company vehicles, and picketing with more than a specified number of people at designated sites." *Id.* at 823, 114 S.Ct. at 2555. After contempt hearings, the Circuit Court of Virginia, Russell County, fined the Union $642,000 for its disobedience. The court also set out a schedule of fines for future contempts, including "$100,000 for any future violent breach of the injunction and $20,000 for any future nonviolent infraction." *Id.* The court noted that its purpose was to "impos[e] prospective civil fines[,] the payment of which would only be required if it were shown the defendants disobeyed the Court's orders." *Id.* The defendants proceeded to violate the injunction 400 times. In accordance with the schedule it had laid out, the court levied a total of $64,000,000 in fines against the Union. Of that amount,

$12,000,000 was to be paid to the victim companies and the remaining $52,000,000 was to be paid to the Commonwealth of Virginia and to two counties where most of the illegal activity took place. *Id.* at 825, 114 S.Ct. at 2556.

Ultimately, the underlying labor dispute was settled, and the parties moved to vacate the outstanding contempt fines. The court granted the motion as to the $12,000,000 in fines payable to the companies, but refused to vacate the $52,000,000 in fines payable to Virginia, reasoning that they were civil, coercive and payable to the public. *Id.* On appeal, the Union argued that the fines were criminal in nature and could not properly be imposed absent a criminal trial. The Supreme Court of Virginia disagreed, holding that:

[w]hen a court orders a defendant to perform an affirmative act and provides that the defendant shall be fined a fixed amount for each day he refuses to comply, the defendant has control of his destiny. The same is true with respect to the court's orders in the present case. A prospective fine schedule was established solely for the purpose of coercing the Union to refrain from engaging in certain conduct. Consequently, the Union controlled its own fate.

*Bagwell v. International Union, United Mine Workers of America,* 244 Va. 463, 477, 423 S.E.2d 349 (1992).

The Supreme Court of the United States reversed, holding that in cases involving the levy of "contempt fines for widespread, ongoing, out-of-court violations of a complex injunction ... disinterested factfinding and even-handed adjudication were essential, and petitioners were entitled to a criminal jury trial." 512 U.S. at 838, 114 S.Ct. at 2562. The Court "decline[d] to conclude that the mere fact that the sanctions were announced in advance rendered them coercive and civil as a matter of constitutional law." *Id.* The Court noted, however, that

[a] contempt fine ... is considered civil and remedial if it either "coerce[s] the defendant into compliance with the court's order, [or] ... compensate[s] the complainant for losses sustained." Where a fine is not compensatory, *it is civil only if*

*the contemnor is afforded an opportunity to purge.* Thus, a "flat, unconditional fine" totalling even as little as $50 announced after a finding of contempt is criminal *if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance.*

*Id.* at 829, 114 S.Ct. at 2558 (quoting *United States v. United Mine Workers of America,* 330 U.S. 258, 303–04, 67 S.Ct. 677, 701–02, 91 L.Ed. 884 (1947) and *Penfield Co. v. S.E.C.,* 330 U.S. 585, 588, 67 S.Ct. 918, 920, 91 L.Ed. 1117 (1947), respectively) (emphasis added). The above language clearly allows non-compensatory sanctions to be deemed civil where contemnors are given a subsequent opportunity to purge.

As noted by the Court in *Bagwell, United States v. United Mine Workers of America,* 330 U.S. 258, 305, 67 S.Ct. 677, 702, 91 L.Ed. 884 (1947) is the Court's "sole prior decision squarely addressing the judicial power to impose coercive civil contempt fines." *Bagwell,* 512 U.S. at 829, 114 S.Ct. at 2558. In *United Mine Workers,* an earlier labor case also having the United Mine Workers as defendant, the Union and its president were held in criminal and civil contempt for violating a temporary restraining order forbidding them from terminating the Krug–Lewis Agreement, a labor contract entered into between the Union and the Government.[8] In spite of the order, the defendants circulated to union members a notice terminating the agreement, resulting in a nation-wide strike that threatened to cripple the national economy. *United Mine Workers,* 330 U.S. at 303, 67 S.Ct. at 701. The district court imposed criminal fines of $10,000 against John L. Lewis, the president of the Union, and $3,500,000 against the Union. *Id.* at 302, 67 S.Ct. at 700–01.

On appeal, the Supreme Court noted that where the purpose of a civil sanction is to make the defendant comply with the injunction, a court must

consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired. . . . [As] a corollary of the above principles . . . a court . . . must . . . consider the amount of defendant's financial resources and the consequent seriousness of the burden to that particular defendant.

330 U.S. at 304, 67 S.Ct. at 701. The Court upheld a fine of $10,000 against Lewis but held that the $3,500,000 fine levied against the Union as punishment for its criminal contempt was excessive. Applying the principles laid out above, the Court reasoned that a criminal, unconditional fine of $700,000 against the Union was warranted. The Court held that "in order to coerce the defendant union into a future compliance with the court's order, it would have been effective to make the other $2,800,000 of the fine conditional on the defendant's failure to purge itself within a reasonable time." *Id.* at 305, 67 S.Ct. at 702. Since the fine was conditional, and thus avoidable, there was no need to calibrate it to the Union's financial resources. In the Court's mandate, the Union was given five days to show that it had fully complied with the temporary restraining order. *Id.* To comply, the Union had to withdraw the notice terminating the labor agreement and notify its members of such withdrawal in substantially the same manner in which the notice of termination had been communicated. *Id.* Additionally, the Union had to instruct its members that the labor agreement was in full force and effect. *Id.* Summarized by Justice Blackmun in *Bagwell, United Mine Workers* stands for the proposition that "fixed fines also may be considered purgable and civil when imposed and suspended pending future compliance." *Bagwell,* 512 U.S. at 829, 114 S.Ct. at 2558.

This Court recognizes that, like in *Bagwell,* the non-compensatory fines herein sanctioned widespread, indirect contempts of a complex injunction. However, even *Bagwell*

---

8. At the time, the Government was in possession of and operating a major portion of the country's bituminous coal mines pursuant to Executive Order 9728, 11 F.R. 5593. President Truman had authorized government seizure of some of the mining facilities when the production of bituminous coal had been interrupted by labor strife, disrupting the economic transition from war to peace.

acknowledges that a subsequent opportunity to purge gives the contemnor the proverbial key to his cell, making the contempt civil and the sanction one that may be imposed absent criminal procedural protections.

As recently as last year, a panel of the Second Circuit noted that "[u]nder Bagwell, a noncompensatory fine is civil, and thus may ordinarily be imposed in the absence of a criminal trial '... if the contemnor is afforded an opportunity to purge.'" *People v. Operation Rescue National,* 80 F.3d 64, 68 n. 7 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 85, 136 L.Ed.2d 42 (1996) (quoting *Bagwell,* 512 U.S. at 829, 114 S.Ct. at 2558 (citation omitted)). In that case, which also involved an injunction restricting demonstrations in front of abortion clinics, because the respondent did not challenge his fine on appeal, the Second Circuit did not reach the issue of whether the Court's judgment "provided [respondent] with the sort of 'opportunity to purge' that Bagwell requires." *Id.*

Also last year, the District Court for the District of Columbia was presented with similar issues. In *N.O.W. v. Operation Rescue,* 37 F.3d 646 (D.C.Cir.1994), which also involved contempts of an injunction prohibiting the blockading of abortion clinics, the D.C.Circuit vacated the District Court's levy of noncompensatory fines, remanding the case to the District Court

> to make an express determination as to the existence, nature, and extent of any such compensable damages, and to tailor compensatory civil fines accordingly.... Any fines for out-of-court violations of this complex injunction not expressly determined to be compensatory *or otherwise falling into a category appropriate for treatment as a civil contempt under Bagwell,* however, must be regarded as criminal, entitling the alleged contemnors to criminal procedural protections.

37 F.3d at 661 (emphasis added). The D.C.Circuit also recognized that under *Bagwell,* some categories of non-compensatory contempt sanctions, *i.e.* where the contemnors were given a subsequent opportunity to

purge, could be considered civil. Like the Permanent Injunction here, the order in *Operation Rescue* established a schedule of escalating, prospective fines for violations. *Id.* at 650. On remand, the District Court for the District of Columbia readily conceded that the noncompensatory fines imposed for civil contempts were criminal in nature. *N.O.W. v. Operation Rescue,* 929 F.Supp. 461, 463–64 (D.D.C.1996). The issue became whether prosecutions for criminal contempt could be initiated more than one year after the contumacious activity had occurred. *Id.* at 464–65. The court concluded that the contempts, which also constituted the local offense of "incommoding," were governed by 18 U.S.C. § 402, which provides that:

> Any person, corporation or association willfully disobeying any lawful writ, process, order, rule, decree, or command of any district court of the United States or any court of the District of Columbia, by doing any act or thing therein, or thereby forbidden, if the act or thing so done be of such character as to constitute a criminal offense under any statute of the United States or under the laws of any State in which the act was committed shall be prosecuted for such contempt as provided in section 3691 of this title and shall be punished by a fine under this title or imprisonment, or both.

Section 402 has a one-year statute of limitations. Thus, the court ruled that the prosecutions for the contempts, none of which had occurred within the previous year, were time-barred. *N.O.W. v. Operation Rescue,* 929 F.Supp. at 465. The court declined to address a motion for inclusion of a purge provision in the injunction, deciding instead to terminate the permanent injunction in view of "[t]he passage of time, without further violation, and Congress' creation of a federal criminal sanction." *Id.* at 466.[9]

*Operation Rescue* is virtually indistinguishable from the case at bar. A factual resemblance between the cases, however, does not require that this Court follow the result reached by the District Court for the

---

**9.** For the reasons set forth in section I, *supra,* this Court declines to terminate the Permanent Injunction herein.

District of Columbia. Like the injunction in *Operation Rescue,* the Permanent Injunction here was crafted, and the contempt sanctions imposed, without the benefit of the Supreme Court's analysis in *Bagwell.* Under the Supreme Court's teachings in *United Mine Workers* and *Bagwell,* the scale of escalating fines set out in the Permanent Injunction could have been properly imposed as civil had contemnors been afforded a subsequent opportunity to purge.

Moreover, the Court finds that under the circumstances of this case, the amount of the fines imposed, ranging from $25,000–$100,000, was appropriate. Under *United Mine Workers,* unconditional, prospective fines intended to coerce compliance must be set in accordance with the defendants' financial resources. Where the fine is conditional, however, there is no need to adjust it to contemnor's financial resources. Thus, in *United Mine Workers,* a fine of $2,800,000, not discernibly calibrated to the Union's finances, was upheld where defendants were given an opportunity to purge. Even if the Court is required to consider defendants' resources in imposing a non-compensatory contempt sanction, the defendants and non-party respondents in this case failed to provide the Court with financial information that may have warranted a reduction in the amounts of the sanctions.[10] As is painstakingly documented in this Court's prior opinions, defendants organized and coordinated several blockades of abortion clinics in flagrant violation of the Permanent Injunction and in an effort to "face down" this Court, 732 F.Supp. at 395, encouraging demonstrators "to engage in 'total, complete non-cooperation' with the police." *Id.* (citation omitted). Clearly, meaningful sanctions were required to coerce compliance with the Court's orders.

The Court is not inclined to stay collection of the fines levied against defendants without a promise that, in the future, they will adhere

to the orders entered in this case. Modifying the Permanent Injunction to include a purge provision would bring it into compliance with *Bagwell.* Defendants' argument that this Court is without authority to modify the injunction is meritless, since "[t]he power of a court of equity to modify a decree of injunctive relief is long-established, broad, and flexible." *New York State Ass'n for Retarded Children, Inc. v. Carey,* 706 F.2d 956, 967 (2d Cir.), *cert. denied,* 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983).[11] Defendants can avoid payment of the fines by agreeing to obey the Permanent Injunction in the future. Accordingly, the parties are directed to settle on notice a Modified Permanent Injunction affording contemnors the "subsequent opportunity to purge" contemplated by *United Mine Workers* and *Bagwell.*

**III.** *The Award of Attorneys' Fees for Prosecuting the Motion for Contempt*

It is well settled in this Circuit that costs, including reasonable attorneys' fees, may be awarded to the party who prosecutes a contempt motion as an appropriate compensatory sanction for contumacious behavior. *Hutto v. Finney,* 437 U.S. 678, 689 n. 14, 98 S.Ct. 2565, 2573, 57 L.Ed.2d 522 (1978); *Weitzman v. Stein,* 98 F.3d 717, 719 (2d Cir.1996); *Manhattan Indus., Inc. v. Sweater Bee By Banff, Ltd.,* 885 F.2d 1, 8 (2d Cir.1989), *cert. denied,* 494 U.S. 1029, 110 S.Ct. 1477, 108 L.Ed.2d 614 (1990); *N.A. Sales Co., Inc. v. Chapman Indus. Corp.,* 736 F.2d 854, 858 (2d Cir.1984); *Vuitton et Fils S.A. v. Carousel Handbags,* 592 F.2d 126, 130 (2d Cir.1979); *Backo v. Local 281, United Brotherhood of Carpenters and Joiners of America,* 438 F.2d 176, 182 (2d Cir.1970), *cert. denied,* 404 U.S. 858, 92 S.Ct. 110, 30 L.Ed.2d 99 (1971); *W.E. Bassett Co. v. Revlon, Inc.,* 435 F.2d 656, 665 n. 5 (2d Cir.1970); Rule 43(a), Civil Rules of the United States Courts for the Southern and Eastern Districts of New York ("A rea-

**10.** In its February, 1990 Opinion, the Court noted that, "[n]either defendants nor respondents provided the Court with any financial information upon which the burden of imposing the sanction on them might be evaluated, and this failure may not be charged against plaintiffs in determining the reasonableness of the fine." 732 F.Supp. at 405, n. 13.

**11.** In *Operation Rescue,* the D.C. Circuit noted that "it [was] not too late to correct course; but the precise correction required in this case is a matter appropriately left to the district court in the first instance." 37 F.3d at 662.

sonable counsel fee, necessitated by the contempt proceedings, may be included as an item of damage.")

■ For the victim of a contempt to be awarded attorneys' fees for prosecuting the contempt, contemnor's conduct must have been willful. *Weitzman,* 98 F.3d at 719; *Vuitton,* 592 F.2d at 130. A willful contempt is one where "contemnor had actual notice of the court's order, was able to comply with it, did not seek to have it modified, and did not make a good faith effort to comply." *E.E.O.C. v. Local 638, Sheet Metal Workers' Int'l Ass'n,* 889 F.Supp. 642, 670–71 (S.D.N.Y.1995) (citation omitted). As is detailed in this Court's February 1990 Opinion, the contempts at issue here were clearly willful. All of the defendants and non-party respondents held in contempt had notice of the orders.[12] Contemnors easily could have complied with the orders by abandoning their efforts to obstruct access to the clinics. Thus, their continued blockading of clinics even after receiving notice of the Orders entered in this case demonstrates that the several defendants and non-party respondent contemnors did not make a good faith effort to ·comply with the orders. As previously noted by this Court, "[t]he evidence more than adequately demonstrates the intentional violation of the three orders of this Court by the various defendant and respondent contemnors." 732 F.Supp. at 409.

Recently, the Second Circuit noted that "a district court, having found willful contempt, would need to articulate persuasive grounds for any denial of compensation for the reasonable legal costs of the victim of contempt." *Weitzman,* 98 F.3d at 719. Therefore, this Court will reinstate the award of attorney's fees here, where the underlying contempts were indeed willful.

The Court sees no reason to revisit the amount of attorneys' fees and costs awarded. The Second Circuit has repeatedly held that "trial courts enjoy considerable discretion in determining the appropriate amount of attorney fees." *Weitzman,* 98 F.3d at 720 (citing *King v. Allied Vision, Ltd.,* 65 F.3d 1051, 1063 (2d Cir.1995); *McGuire v. Russell Miller, Inc.,* 1 F.3d 1306, 1313 (2d Cir.1993)). The Court divided the prosecution of the contempt motion into two phases. The first phase—the costs of which were assessed against all contemnors—involved the collection of evidence of violations of this Court's orders and the drafting of the Order to Show Cause for Civil Contempt by plaintiffs' counsel. 737 F.Supp. at 1363. The second phase consisted of the time spent by plaintiffs preparing for and conducting the August 1989 evidentiary hearing on the contempt motion against A. Nathanson, B. Nathanson, and Pearson. *Id.* Accordingly, the costs for the second phase were assessed only against A. Nathanson and Pearson.[13] For both phases,

12. All of the demonstrations were organized and coordinated by Operation Rescue and its leader, Terry. Herlihy was personally served with a copy of the May 4, 1988 Order during the May 6, 1988 demonstration. 732 F.Supp. at 399. Lee discussed the Preliminary Injunction at a B.O.R.N. rally held on October 27, 1988. Thus, both Lee and B.O.R.N. had knowledge of the October 27, 1988 Order. *Id.* at 405. Additionally, Lee was personally served with a copy of the Permanent Injunction on January 12, 1989, before he participated in the January 13, 1989 demonstration at the Margaret Sanger Clinic. *Id.* Foreman and McMonagle were each personally served with a copy of the Permanent Injunction on January 12, 1989. *Id.* at 406. White was present when the Permanent Injunction was read aloud by police during the January 13, 1989 demonstration at the Margaret Sanger Clinic. *Id.* Talluto and La Penna were both present when the October 27, 1988 Order was read aloud during the October 29, 1988 demonstration at the Women's Pavilion Clinic in Deer Park. *Id.* They were both subsequently arrested. *Id.* Tal-

luto was present during the January 14, 1989 demonstration before the V.I.P. clinic when the Permanent Injunction was read aloud before the police began making arrests. *Id.* Adelle Nathanson was present at the demonstration at the Women's Pavilion Clinic in Dobbs Ferry where the October 27, 1988 Order was read aloud on two occasions. A videotape shows Pearson standing a few feet from a police officer who read the contents of the Permanent Injunction during the January 14, 1989 demonstration at the V.I.P. Clinic in Manhattan.

13. B. Nathanson was not adjudged in contempt since the Court found no clear and convincing evidence that he had violated the Permanent Injunction by blocking access to the Margaret Sanger Clinic in Manhattan on January 14, 1989. B. Nathanson appeared to heed the reading of the Permanent Injunction, denied that he had been in the area, and had not been arrested like hundreds of other demonstrators. 732 F.Supp. at 407.

the Court carefully calculated each contemnor's *pro rata* share of costs based on documentation provided to the Court by plaintiffs. *Id.* at 1363–66. Indeed, the contemnors did "not challenge[ ] the reasonableness of the time spent by plaintiffs' counsel, the rates sought, or the amount of costs incurred in either phase." *Id.* at 1364. However, since the judgments of contempt entered against non-party respondents Talluto and La Penna were reversed by the Second Circuit on the ground that this Court lacked jurisdiction over them,[14] this Court's order that they pay a *pro rata* share of plaintiffs' attorneys' fees is vacated. Accordingly, the costs of prosecuting the motions for contempt against Talluto and La Penna will be borne by plaintiffs.

**IV. *The Award of Attorneys' Fees Under 42 U.S.C. § 1988***

■ Under the Second Circuit's mandate, this Court must reconsider its award of attorneys' fees to plaintiffs as prevailing parties on their civil rights claim in light of the Supreme Court's ruling in *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993). In *Bray*, the Supreme Court held that for § 1985(3) purposes, women seeking abortions did not constitute a qualifying class and that the goal of preventing abortions did not constitute "invidiously discriminatory animus" toward women. 506 U.S. at 269, 274, 113 S.Ct. at 759, 761. The Court ruled that since plaintiffs "were not entitled to relief under § 1985(3), they were also not entitled to attorney's fees and costs under 42 U.S.C. § 1988." *Id.* at 285, 113 S.Ct. at 768. Accordingly, the Supreme Court vacated the award of fees. *Id.* In *Operation Rescue*, the D.C.Circuit reached the same result. 37 F.3d at 653–54.

Both of those cases, however, differ from the instant action in one important respect. In *Bray* and *Operation Rescue*, the Supreme Court and the D.C. Circuit, respectively, reversed the district courts' findings that plaintiffs had prevailed on their civil rights claims. That is not the case here, where this Court's grant of summary judgment,[15] holding that plaintiffs prevailed on their § 1985(3) claim, stands. The Court of Appeals affirmed that Order,[16] and defendants' petition for a writ of certiorari was denied. As noted by Justice Jackson in *Brown v. Allen*,

> for the case in which certiorari is denied, its minimum meaning is that this Court allows the judgment below to stand with whatever consequences it may have upon the litigants involved under the doctrine of *res judicata* .... A civil or criminal judgment usually becomes *res judicata* in the sense that it is binding and conclusive even if new facts are discovered and even if a new theory of law were thought up.

344 U.S. 443, 543, 73 S.Ct. 397, 428, 97 L.Ed. 469 (1953) (Jackson, J., concurring). This Court's holding that plaintiffs are prevailing parties on their civil rights claim is therefore *res judicata*.

■ The question remains, however, whether *Bray*, applied retroactively, mandates vacatur of the award of attorneys' fees.[17] Under 42 U.S.C. § 1988, "the court in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs." Although the statute makes the award of fees discretionary, there is generally "a presumption that successful civil rights litigants should recover reasonable attorney's fees unless special circumstances render such an award unjust." *DiFilippo v. Morizio*, 759 F.2d 231, 234 (2d Cir.1985) (citing S.Rep. No. 1011, 94th Cong., 2d Sess. 4,

**14.** 961 F.2d 390, 393 (2d Cir.1992).

**15.** This Court's Opinion granting plaintiffs summary judgment on their civil rights claim is reported at 704 F.Supp. 1247 (S.D.N.Y.1989).

**16.** *N.O.W. v. Terry*, 886 F.2d 1339 (2d Cir.1989), *cert. denied*, 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990).

**17.** The award of § 1988 attorneys' fees, *N.O.W. v. Terry*, 737 F.Supp. 1350 (S.D.N.Y.1990), was on direct review when the Supreme Court decided

*Bray*, and thus was subject to the retroactive application of any new principles of federal law announced in *Bray*. *See Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 97, 113 S.Ct. 2510, 2517, 125 L.Ed.2d 74 (1993) (holding that when the Supreme Court "applies a [new] rule of federal law ... that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review").

# 1046

reprinted in 1976 U.S.Code Cong. & Ad. News 5908, 5912); see also Hensley v. Eckerhart, 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983); Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 402, 88 S.Ct. 964, 966–67, 19 L.Ed.2d 1263 (1968) (per curiam ).

To overcome this presumption, defendants must show special circumstances that would render the award of attorneys' fees unjust. Hensley, 461 U.S. at 429, 103 S.Ct. at 1937 (citation omitted). Such circumstances do not exist, however, where the action before the Court "involve[s] 'serious threats to constitutional rights, or effectuating congressional policies of high priority.'" Rivera v. LaPorte, No. 82 Civ. 0291, 1990 WL 186842 at *1 1990 U.S.Dist. LEXIS 15736 at *3 (S.D.N.Y. Nov. 13, 1990) (quoting Naprstek v. City of Norwich, 433 F.Supp. 1369, 1371 (N.D.N.Y.1977)). The instant action involves interference with the constitutional right to choose an abortion. Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 846, 112 S.Ct. 2791, 2804, 120 L.Ed.2d 674 (1992). Congress' enactment of the Federal Access to Clinic Entrances Act of 1994, in response to the Supreme Court's decision in Bray, further demonstrates that preventing the exact conduct at issue in this case is a "congressional policy of high priority." Given these circumstances, defendants have failed to overcome the presumption in favor of awarding attorneys' fees to plaintiffs.[18]

Since Bray does not affect this Court's final decision that plaintiffs prevailed on their civil rights claims, plaintiffs should receive all of the attendant benefits, including fees. Nothing in the Second Circuit's mandate precludes this result, since that mandate requires this Court only to reconsider the award of attorneys' fees. Accordingly, the Court's July 9, 1990 Order awarding plaintiffs attorneys' fees as prevailing parties on their civil rights claim is hereby reinstated.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for reinstatement of the May 10, 1990 Order and the July 9, 1990 Order is granted. The Court's Order of May 10, 1990 adjudging defendants in contempt and imposing noncompensatory sanctions on defendants is reinstated on condition that defendants and non-party respondents are given an opportunity to purge themselves of the contempts and avoid the noncompensatory fines. Finally, the Court's Order of July 9, 1990 awarding plaintiffs attorneys' fees incurred in bringing a motion for contempt and as prevailing parties on their civil rights claim is reinstated.

Settle Modified Permanent Injunction and Order on notice.

---

**18.** Since defendants' only argument against reinstatement of § 1988 attorneys' fees was a collateral attack on this Court's final order granting plaintiffs summary judgment on their civil rights claim, the Court need not revisit its methodology in calculating the award of § 1988 attorneys' fees.